UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
Louisville Division
**\*\*ELECTRONICALLY FILED\*\***

JANE DOE,                                              )
                                                       )
                                    Plaintiff,         )
                                                       )
v.                                                     )
                                                       )
THE SUPREME COURT OF KENTUCKY,                         )        **CIVIL RIGHTS COMPLAINT**
        Serve:  Office of the Attorney General         )        **JURY TRIAL DEMANDED**
                Andrew Graham Beshear                   )
                700 Capital Ave, Rm 118                 )        **CASE NUMBER:**
                Frankfort, KY 40601                     )        **3:19-cv-00236-GNS**
                andrewbeshear@yahoo.com                 )
                                                       )
THE KENTUCKY BAR ASSOCIATION,                          )
        Serve:  John D. Meyers, Exec. Director         )
                514 W. Main St.                         )
                Frankfort, KY 40601                     )
                jmeyers@kybar.org                       )
                                                       )
THE KENTUCKY BOARD OF BAR                               )
EXAMINERS,                                              )
        Serve: Gerald F. Dusing, Chairman              )
                514 W. Main St.                         )
                Frankfort, KY 40601                     )
                gdusing@aswdlaw.com                     )
                                                       )
THE  KENTUCKY  OFFICE  OF  BAR                          )
ADMISSIONS,                                             )
        Serve:  Elizabeth Susan Feamster               )
                1510 Newtown Pike, #156                 )
                Lexington, KY 40511                     )
                elizabethf@kyoba.com                    )
                                                       )
THE KENTUCKY BAR CHARACTER AND                          )
FITNESS COMMITTEE,                                      )
        Serve:  Chairman Grant Helman                  )
                514 W. Main St.                         )
                Frankfort, KY 40601                     )
                ghelman@helmanrice.com                  )
                                                       )
THE KBA BOARD OF GOVERNORS,                             )
        Serve:  Douglas Ballantine                     )

2000 PNC Plaza )
500 W. Jefferson St. )
Louisville, KY 40202 )
douglas.ballantine@skofirm.com )

)
THE KENTUCKY LAWYERS' )
ASSISTANCE PROGRAM FOUNDATION, )
INC., )
    Serve:  3300 LLC )
        Jeffery A. McKenzie )
        3500 PNC Tower )
        101 S. 5th Street )
        Louisville KY 40202 )
        jmckenzie@bgdlegal.com )

)
ELIZABETH SUSAN FEAMSTER, Individually )
and in her Official Capacity as Director and )
General Counsel of KYOBA/KBA, )
    Serve:  1510 Newtown Pike, #156 )
        Lexington, KY 40511 )
        elizabethf@kyoba.com )

)
PAMELA YVETTE HOURIGAN, )
Individually and in her Official Capacity as )
Director of KYLAP, )
    Serve:  514 West Main Street )
        Lexington, KY 40601 )
        yhourigan@kylap.org )

)
GRANT HELMAN, in his Official Capacity as )
Chair of the KBA Character and Fitness )
Committee, )
    Serve:  514 W. Main St. )
        Frankfort, KY 40601 )
        ghelman@helmanrice.com )

)
SUSAN COLEMAN LAWSON, in her )
Official Capacity as Member of the KBA )
Character and Fitness Committee, )
    Serve:  514 W. Main St. )
        Frankfort, KY 40601 )
        susan.lawson96@gmail.com )

)
GARY DUDLEY PAYNE, in his Official )
Capacity as Member of the KBA Character )
and Fitness Committee, )
    Serve:  514 W. Main St. )



Frankfort, KY 40601 )
)
DAVID BRYAN SLOAN, in his Official )
Capacity as Member of the KBA Character )
and Fitness Committee, )
    Serve:  514 W. Main St. )
          Frankfort, KY 40601 )
          dsloan@oharataylor.com )
)
KRISTEN NORTHCUTT, in her Official )
Capacity as Deputy Director of the Kentucky )
Office of Bar Admissions, )
    Serve:  1510 Newtown Pike, #156 )
          Lexington, KY 40511 )
          kristen@kyoba.org )
)
LISA LARKEY, in her Official Capacity as )
Exam Administrator of the Kentucky Office of )
Bar Admissions, )
    Serve:  1510 Newtown Pike, #156 )
          Lexington, KY 40511 )
          lisal@kyoba.org )
)
STEPHANIE   THOMAS,   in   her   Official )
Capacity   as   Application   Analyst   of   the )
Kentucky Office of Bar Admissions, )
    Serve:  1510 Newtown Pike, #156 )
          Lexington, KY 40511 )
          stephanie@kyoba.com )
)
AND OTHER UNKNOWN DEFENDANTS, )
INDIVIDUALLY    AND    IN    [THEIR] )
OFFICIAL CAPACITY, )
                    Defendants. )
)

## **COMPLAINT**

COMES NOW, the Plaintiff, by and through the undersigned counsel, BRITT

STEVENSON, and files this cause of action against Defendants, THE KENTUCKY SUPREME

COURT ("SCOKY"), and its administrative agencies, KENTUCKY BOARD OF BAR

EXAMINERS ("KBBE"), KENTUCKY OFFICE OF BAR ADMISSIONS ("KYOBA"),

KENTUCKY BAR ASSOCIATION ("KBA"), KENTUCKY BAR CHARACTER AND FITNESS COMMITTEE ("CFC"), THE KBA'S BOARD OF GOVERNORS ("KBG"), KENTUCKY LAWYERS' ASSISTANCE PROGRAM ("KYLAP") and the following persons: ELIZABETH SUSAN FEAMSTER (KYOBA and KBA Director/General Counsel), PAMELA YVETTE HOURIGAN (KYLAP Director), GRANT HELMAN (CFC Chair), SUSAN C. LAWSON (CFC), GARY D. PAYNE (CFC), DAVID B. SLOAN (CFC), KRISTEN NORTHCUTT (KYOBA), LISA LARKEY (KYOBA) and STEPHANIE THOMAS (KYOBA), and avers as follows:

## JURISDICTION & VENUE

1.     This Honorable Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, The Americans with Disabilities Act ("ADA"), 42 U.S.C. 12131-12134, and its implementing regulation, 28 CFR Part 35, and § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701 et seq. ("RA" and "§504").

2.     Supplemental jurisdiction over state law claims is pursuant to 28 U.S.C. § 1367.

3.     Venue is proper in the Western District of Kentucky, Louisville Division, pursuant to 28 U.S.C. §§ 1391(b)(2) as the events and/or omissions giving rise to the Plaintiff's claims occurred and are occurring within this judicial district.

## THE PARTIES

4.     The Plaintiff requests anonymity to prevent further injustice. Plaintiff is an attorney, first licensed to practice law in Florida in 2006, and conditionally licensed in Kentucky as of April 28, 2016. Plaintiff is a resident of the State of Kentucky, residing in the Western District. Plaintiff is a person with a qualifying disability and is otherwise *sui juris*.

5.     Defendant, The SCOKY, was created in 1975 by state constitutional amendment (Section 110). SCOKY has exclusive jurisdiction to regulate the admissions of persons to the

practice of law. SCOKY has discretion to review, approve and create rules governing bar admissions and membership. SCOKY, and its affiliated agencies, are "state entities" within the definitions of Title II of the ADA, 42 U.S.C. § 12131(1).

6.      Defendant, The KBA, was created by SCOKY in SCR 3.025 (1980), and defines itself as "an independent agency of [SCOKY]" on its website. Defendant, KBG, is the elected governing body of the KBA. The KBA is a "commercially-oriented organization" operating with federal tax exemption under § 501(c)(6) of the IRS Code of 1954. The KBA possesses the sole authority to regulate lawyers in Kentucky. The KBA consists of approximately 18,720 active and inactive attorneys. According to KBA financial statements dated June 30, 2017, the KBA is "adequately covered by insurance or by accruals when determinable." The KBA is a "state entity" for purposes of ADA analysis.

7.      Defendant, The KBBE, administers the bar examination and oversees bar admission qualifications, procedures and related issues. The KBBE is a "state entity" for purposes of ADA analysis.

8.      Defendant, The KBA's CFC, is an administrative board within the SCOKY which conducts hearings and makes character and fitness determinations regarding member applications and disciplines attorneys after admission for allegations of malpractice and other bad acts. For purposes of ADA analysis, the CFC is a "state entity".

9.      Defendant, GRANT HELMAN, is an attorney and the chair of the CFC. He conducts hearings investigating the character and fitness of KBA applicants and members. Helman reports the CFC's findings and conclusions to SCOKY. The CFC makes determinations regarding the admission, conditional admission, suspension and revocation of bar members' licenses. Helman is being sued in his official capacity.

10.     Defendant, SUSAN C. LAWSON, is an attorney and member of the CFC. She conducts hearings investigating the character and fitness of applicants and members of the KBA. She reports findings and conclusions to SCOKY affecting the admission, conditional admission, suspension and revocation of Kentucky law licenses. Lawson is being sued in her official capacity.

11.     Defendant, GARY D. PAYNE, is an attorney and member of the CFC. He conducts hearings investigating the character and fitness of applicants and members of the KBA. He reports findings and conclusions to SCOKY affecting the admission, conditional admission, suspension and revocation of Kentucky law licenses. Payne is being sued in his official capacity.

12.     Defendant, DAVID B. SLOAN, is an attorney and member of the CFC. He conducts hearings investigating the character and fitness of applicants and members of the KBA. He reports findings and conclusions to SCOKY affecting the admission, conditional admission, suspension and revocation of Kentucky law licenses. Sloan is being sued in his official capacity.

13.     Defendant, KENTUCKY OFFICE OF BAR ADMISSIONS ("KYOBA") analyzes member applications and conducts investigations, with the power to divert applications to the CFC for further review. KYOBA works in conjunction with the CFC to recommend admission to candidates which show good character and fitness standards. In accordance with SCR 2.002 (7), "[e]ach member of the Board and the Committee and each employee given responsibility by the Board and the Committee for the receipt or disbursement of funds shall be bonded in an amount specified by the Board and the Committee". KYOBA is a "state entity".

14.     Defendant, ELIZABETH FEAMSTER is an attorney and member of the KBA acting as General Counsel and Director of the KBA, CFC, KBBE, KYOBA and other entities within the KBA. She is sworn to uphold justice and discourage discrimination in the

administration of her duties. Feamster is being sued in both her official, and individual, capacities.

15.     KRISTEN E. NORTHCUTT is the KYOBA Deputy Director, and she is being sued in her official capacity.

16.     LISA LARKEY is the KYOBA Exam Administrator, and she is being sued in her official capacity.

17.     STEPHANIE THOMAS is the KYOBA Application Analyst, and she is being sued in her official capacity.

18.     Defendant, KYLAP and/or "THE KYLAP FOUNDATION" is a Kentucky corporation designated as a 501(c)(3) nonprofit entity created pursuant to SCOKY order SCR 3.910(8) to "assist Kentucky's lawyers, law students and judges who suffer from impairments including drug, alcohol, or other addictions, depression, and other mental health disorders." KYLAP is a "state entity".

19.     Defendant, PAMELA YVETTE HOURIGAN ("Yvette") (KYLAP Director), was paid by the KBA a salary of $81K in 2018. Hourigan is responsible for executing orders of conditional agreements mandated by SCOKY and its affiliated entities (i.e. CFC, KYOBA and KBBE). Hourigan is an attorney licensed by the KBA and acting Director of KYLAP with reporting capability that influences the KBA's membership decisions. She is sworn to uphold justice and discourage discrimination in the administration of her duties. Hourigan is being sued in both, official and individual, capacities.

## INTRODUCTION

20.     Congress created the Americans with Disabilities Act ("ADA") to address arbitrary and irrational discrimination against disabled persons, and those regarded as having disabilities, so that no qualified individual with a disability shall, by reason of such disability, be

excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public or "state entity", or be subjected to discrimination by any such entity.

21.     The Kentucky Supreme Court ("SCOKY") created The Kentucky Bar Association ("KBA") to govern the admission and discipline of attorneys in the state. The KBA is a "state entity" under the ADA.

22.     Plaintiff is resident of Jefferson County, Louisville, Kentucky that sought admission to her home state bar in 2016 after practicing law in Florida for ten years in good standing. The KBA regarded Plaintiff as unfit and/or lacking sufficient character after she revealed her Bipolar I Disorder diagnosis on her bar application. After passing the exam and submitting personal medical records, she received a "conditional admission" to practice law from the KBA. If Plaintiff wished to practice law, she would have to agree to conditional admission and submit to intrusive monitoring by the Kentucky Lawyers' Assistance Program ("KYLAP") for three (3) years.

23.     When Plaintiff raised concerns with the arduous agreements as being non-compliant with her rights under the ADA, she was subjected to retaliation and punishment from the KBA and KYOBA, by and through its Director and General Counsel, Elizabeth Feamster, and KYLAP, by and through its Director, Yvette Hourigan, as well as the members of the KBA's Character and Fitness Committee ("CFC"), Grant Helman, Susan Lawson, Gary Payne and David Sloan.

24.     Plaintiff, in good faith, sought to rectify the KBA's misplaced concerns for 28 months, hired counsel, negotiated terms, complied with the KBA's investigations, responded to orders to show cause, appeared at hearings, paid bar dues, completed continuing education requirements, signed contracts, made disclosures, revealed private medical records, minded the

KBA's residency restrictions and forwent employment opportunities to no avail. Plaintiff was, ultimately, wrongfully suspended from legal practice for 853 days.

25.     The conditional licensing scheme utilized by the KBA causes lawyers to be automatically categorized as unfit and/or lacking character required to practice law if they report certain medical history information. Attorneys regarded as having disabilities are subjected to more investigations and punitive conditions than applicants reporting no disability. Disabled applicants are faced with either abandoning the profession or acquiescing to unnecessary and intrusive investigations of their medical history, including deeply personal treatment notes. Attorneys with bipolar diagnoses are ordered to submit to monitoring by KYLAP, regardless of whether or not the attorney has committed acts that would otherwise justify monitoring or punishment. KYLAP monitoring is required even where a disabled person's physician sees no need for such probationary treatment.

26.     Plaintiff's KBA membership was contingent upon two agreements: 1) a three-year conditional admission with monitoring by the bar and 2) a concurrent KYLAP monitoring agreement after she passed the Kentucky Bar Exam in February of 2016. However, when Plaintiff requested ADA-compliant agreements, the KBA and KYLAP retaliated.

27.     Plaintiff's conditional admission agreement with the KBA required her to sign a contract full of boilerplate conditions applied to attorneys with criminal histories (i.e., DUI conviction or drug abuse), as opposed to an agreement tailored to address her disability disclosures. The state defendants and its agents required her to forego her medical privacy, submit to frequent monitoring, inform employers of her contract and its underlying reasons, allow communication between the KBA/CFC/KYLAP/KYOBA and all physicians, permit inspection of medical records past and present, live within the state of Kentucky for the term of the agreement, submit to random substance/alcohol mouth-swab testing, submit to additional

investigations each time she left the state more than one week, seek the bar's permission to accept work out-of-state and other conditions.

28.     Plaintiff raised concerns to the KBA and KYLAP leadership regarding the provisions of the KBA and KYLAP agreements unrelated to her health disclosures. Plaintiff made good faith efforts to fully comply in order to practice law and support herself financially. Plaintiff was maliciously prosecuted for raising concerns about her KYLAP and KBA contracts. Hourigan specifically, maliciously and purposefully retaliated against Plaintiff for raising ADA concerns with her KYLAP agreement. Feamster specifically, maliciously and purposefully retaliated against Plaintiff, and suspended her from the practice of law.

29.     Plaintiff demanded unconditional admission in July of 2018, after the KBA, again, violated the ADA in regard to its investigation of Plaintiff. The KBA granted her demand for full, unconditioned admission on August 28, 2018, 853 days after she was sworn in to practice law on April 28, 2016.

30.     Plaintiff seeks compensatory and punitive damages, compensation for expenses, payment of attorney fees and other legal relief for the deprivation of her due process and equal protection rights, violations of the Americans with Disabilities and Rehabilitation Acts, intentional discrimination, improper interference with contractual relations, intentional infliction of emotional distress, defamation, malicious prosecution and other violations of state and federal civil rights acts.

31.     State bar associations may investigate an attorney applicant's character and fitness to make admissions and disciplinary decisions, and it is an important public service for them to do so. However, state entities that license professionals cannot conduct investigations and punish disabled people without a reasonable basis for doing so. State entities have ample power to

conduct investigations upon members and applicants; but they may not investigate nor discipline its members in violation of federal, or its own state laws.

32.     People with Bipolar Disorder and other mental illnesses may not be disabled in the sense that they are unable to perform work duties. Studies show that a) there is a higher ratio of lawyers and doctors with mental illness concerns than the general public, b) it may derive from motivation or intelligence, or exposure to trauma and c) treatment is helpful. Bipolar and depressed professionals also fear treatment because they are often stigmatized and "regarded as having a disability" in their state professional association if they disclose a history of mental health issues, diagnosis or treatment.

33.     Only a small minority of state bar associations in the U.S. inquire about mental health treatment on applications for admission. Even fewer treat bipolar applicants as lacking character, professionalism, fitness or sobriety because of their illness. A small handful, like the KBA, 1) inquires, 2) then conditions membership and 3) punishes those with Bipolar disorder even if there is no behavioral or medical reason for its actions.

34.     The state defendants and its agents are a state entity that discriminates against applicants and members on the basis of disability, in violation of the ADA, when it (1) makes discriminatory inquiries regarding mental health diagnoses and treatment; (2) subjects applicants to burdensome and costly investigations; (3) mandates disclosure of confidential and protected medical documentation without necessity; (4) makes discriminatory admissions recommendations based on stereotypes; (5) enforces boilerplate conditional admission, monitoring contracts, unnecessary medical evaluations and financial burdens upon people with disabilities; (6) requires disabled members to reside within the state during their conditional licensing term, (7) requires alcohol and drug testing of disabled members absent evidence of abuse, (8) fails to provide adequate confidentiality protections during the admissions process; (9)

implements burdensome, intrusive and superfluous conditions on admission that are improperly based on individuals' mental health diagnoses or treatment; and, among other conduct stated herein, (10) retaliates against disabled applicants for requesting ADA-compliance.

35.     Plaintiff is an experienced attorney licensed in two states, with a diagnosis of Bipolar I Disorder, a qualifying disability under the ADA. She is regarded as having a disability and stigmatized on the basis of her diagnostic label. She applied to take the February 2016 Kentucky Bar Exam, complied with all disclosure requirements and passed the exam. However, because she disclosed her mental illness, she was subjected to strenuous and costly investigations, and only offered conditional admission.

36.     Plaintiff was sworn-in to the KBA on April 28, 2016. Plaintiff advised the KBA's General Counsel Feamster and Hourigan, KYLAP Director, that their standardized agreements for conditional admission and monitoring were inconsistent with the ADA and requested amendments. Plaintiff was unable to independently negotiate with the KBA and hired counsel to negotiate for fair agreements with the KBA and its affiliated non-profit entity, KYLAP. In retaliation, the KBA suspended Plaintiff from practicing law for 853 days and prosecuted "show cause" actions moving for her permanent revocation.

37.     In July of 2018, after two CFC hearings, the KBA continued to make demands for Plaintiff's medical records and treatment notes, and the KBA suggested that an independent medical examination may be required. Since December of 2015, Plaintiff sent six (6) medical records releases and three (3) letters from experts stating that she was in good health and fitness to practice law without concern for public or personal safety.

38.     On August 13, 2018, Plaintiff demanded full and unconditional bar admission, threatened this litigation and, again, expressed ADA-related concerns with the KBA and KYLAP policies. After her 853-day-long fight for her livelihood, the KBA abandoned its prosecutions to

permanently revoke Plaintiff's Kentucky bar license. The KBA granted her full and unconditioned licensure on August 28, 2018. To date, she remains duly licensed in good standing without conditions in two states.

39.     The KBA has denied responsibility for Plaintiff's injuries caused as a result of its discriminatory conduct which impugned her professional character and halted her earning capabilities.

## <u>BACKGROUND AND FACTS</u>

40.     Plaintiff was born and raised in the Commonwealth of Kentucky. She graduated from college at a Kentucky university in 2003, then attended law school and practiced in Florida from 2006 to present.

41.     Plaintiff was diagnosed with Bipolar I Disorder in 2014 after experiencing mania while taking a prescribed antidepressant medication. Without any prior history of illness, Plaintiff began experiencing manic episodes and behaving out of character, although never harmful to herself nor others.

42.     Plaintiff worked in government and private practices in Florida before returning home to Kentucky in 2014 for treatment near family members.

43.     At all times pertinent to this lawsuit, Plaintiff was in good standing with the Florida Bar.

44.     At all times pertinent to this lawsuit, Plaintiff remains a qualified individual with a disability, and/or she is regarded as having a disability by the Defendants. Plaintiff suffers from a mental impairment and/or has a record of impairment which substantially limits one or more of her major life activities.

45.     The Florida Bar, concerned with social media posts by Plaintiff, placed her in a diversion program contract to be monitored by the Florida Lawyers' Assistance Program (FLAP)

for three years (2015 – 2018) whereby Plaintiff's Kentucky physician would monitor and report to the FLAP physicians.

46.     Since her diagnosis, the Plaintiff's medical doctors have encouraged and recommended her to continue in the legal profession without concerns for her, nor the public's, safety.

47.     Plaintiff's psychiatrist monitored her progress and reported prescription and therapy compliance to the FLAP director from 2015 to 2018.

48.     Plaintiff's FLAP agreement did not require residency in Florida, substance testing nor disclosures to her employers.

49.     On June 15, 2018, Plaintiff was released from her Florida diversion agreement, completing all conditions and obtaining a letter from her physician indicating her full compliance with treatment. Plaintiff never violated her FLAP agreement and Plaintiff was never prohibited from practicing law in the state of Florida.

50.     On December 9, 2015, Plaintiff submitted an online application to the KBA, and otherwise complied with SCR 2.022, requesting the KBA's approval to sit for the February 2016 bar exam. Florida does not reciprocate bar admission with other states.

51.     The KBA's application process required Plaintiff to disclose, in questions 31 through 37, that she had a history of depression treatment and Bipolar I Disorder. In compliance with full disclosure and candor requirements of the KBA, Plaintiff responded in good faith (italicized below) to the KBA's questionnaire:

> "31. (1) Within the past five years, have you engaged in any conduct that: (1) resulted in an arrest, discipline, sanction or warning; (2) resulted in termination or suspension from school or employment; (3) resulted in loss or suspension of any license; (4) resulted in any inquiry, any investigation, or any administrative or judicial proceeding by an educational institution, government agency, professional organization, or licensing authority, or in

connection with an employment disciplinary or termination procedure or (5) endangered the safety of others, breached fiduciary obligations, or constituted a violation of workplace or academic conduct rules? If you answered yes, furnish a thorough and detailed explanation below, including the relevant date{s).

> *Yes.*

31. (2) If you answered "yes", explain below, specifically including any asserted defense or claim in mitigation or as an explanation of your conduct as well as all relevant documentation.

> *I was terminated from employment, as previously disclosed, from [redacted] work was no longer available. In regard to the [redacted], I was terminated from employment [redacted] in accordance with a prior agreement at the time of my employment offer. [Redacted.] I was not given the impression that my conduct was at issue, but rather the needs of the [redacted] company.*

32. Within the past five years, have you exhibited any conduct or behavior that could call into question your ability to practice law in a competent, ethical and professional manner?

> *In 2014, I was put on an antidepressant medication by [redacted] which caused me to go into mania shortly thereafter. In a manic phase, I made comments [redacted] on social media. [redacted] civil offense [redacted], the Florida Bar inquired regarding my behavior. After explaining such behavior and releasing medical documentation to the [FLAP], I was permitted to have the complaint diverted to [FLAP] for three years. I now pay a fee to be a… [FLAP] participant and attend regular meetings with my physician who reports to [FLAP]. I was not reprimanded, suspended or further disciplined.*

The purpose of the following questions is to aid the Character and Fitness Committee in determining the current fitness of an applicant to practice law and meet the professional responsibilities of a lawyer. The Committee treats all information confidentially; the mere fact of treatment, monitoring or participation in a support group is not, in itself, a basis on which admission is denied. The Committee on Character and Fitness routinely certifies individuals for admission who have demonstrated personal responsibility and

maturity in dealing with fitness issues. The Committee encourages applicants who may benefit from assistance to seek it. The Committee does not seek Information that is fairly characterized as situational counseling. Examples of situational counseling include stress counseling, domestic counseling, and grief counseling and counseling for eating and sleeping disorders. On occasion, certification may be denied or deferred when an applicant's ability to function is impaired in a manner relevant to the practice of law at the time that the licensing decision is made, or when an applicant demonstrates a lack of candor by his or her responses. This is consistent with the public purpose that underlies the licensing responsibilities assigned to the [CFC] and the Board of Bar Examiners; further, each applicant is responsible for demonstrating that he or she possesses all of the qualifications to practice law.

33.    Do you currently have any condition or impairment (including, but not limited to, substance abuse, alcohol abuse, or a mental, emotional, or nervous disorder or condition) that in a material way affects your ability to practice law in a competent, ethical and professional manner. "Currently" means recently enough that the condition or impairment could reasonably affect your ability to function as a lawyer. If your answer is no, please skip question 34 and proceed to question 35.

   *Yes.*

34.    If your answer to Question 33 is "yes", are the limitations caused by your condition or impairment reduced or ameliorated because you receive ongoing treatment or because you participate in a monitoring or support program?

   *I have a diagnosis of Bipolar I Disorder. This diagnosis was unknown to me prior to 2014. In 2014, [redacted] physician put me on an antidepressant which soon thereafter caused a rare reaction of mania. I was hospitalized, stabilized and diagnosed with Bipolar I. I have been under the treatment of [redacted] and since becoming stabilized, I have remained stabilized and committed to my medications and physician's advice.*

35. Within the past five years, have you ever raised the issue of consumption of drugs or alcohol or the issue of a mental, emotional, nervous, or behavioral disorder or condition as a defense, mitigation or explanation for your actions in the course of

any administrative or judicial proceeding or investigation; any inquiry or other proceeding; or any proposed termination or suspension by an educational institution, employer, government agency, professional organization, or licensing authority?

>  *Yes.*

If your answer is "Yes", furnish a thorough explanation below. Include pertinent names, addresses, dates and references to records, as appropriate:

> *With regard to the Florida Bar inquiry regarding comments unbecoming of an attorney that I made on social media while manic in 2014 (as previously discussed), I raised the defense of my manic state induced by SSRI/antidepressant medications. After seeking medical treatment, it became clear that this highly uncharacteristic behavior was likely mania (dormant Bipolar II disorder that became mania when taking antidepressants as prescribed by my doctor without a mood stabilizing medication). Since my diagnosis as Bipolar I (the diagnosis after a single manic attack), I have been successfully treated for over one year utilizing mood stabilizing medication and uncharacteristic behavior has not continued. The Florida Bar was understanding of my circumstances and diverted my case to the [FLAP] monitored by [redacted].*

36. a) Do you currently have any condition or impairment including, but not limited to, (a) any related substance or alcohol abuse, or (b) a mental, emotional, or nervous disorder or conditions not reported above which in any way affects or If untreated could affect your ability to perform any of the obligation and responsibilities of a practicing attorney in a competent and professional manner? "Currently" means recently enough so that the condition could reasonably have an impact on your ability to function as a practicing attorney.

>  *No.*

36. b) If your answer to Question 36(a) is "Yes", are the limitations or impairments caused by your condition or impairment reduced or ameliorated because you receive ongoing treatment (with or without medication) or because you participate in a monitoring program?

*N/A*

37. a) Have you been declared legally incompetent within the last
five (5) years?

*No*

37. b) If yes, please provide an explanation.

*N/A*"

52.     On December 9, 2015, as required by the KBA application, Plaintiff mailed two
(2) notarized medical records releases allowing the KBA, and its affiliated entities and agents,
complete access to her personal and private medical records, including treatment notes.

53.     On December 10, 2015, Plaintiff supplemented her KBA application with a
certificate of good standing from the Florida Bar Association that revealed no public discipline
since Plaintiff's admission in April of 2006.

54.     On December 17, 2015, Plaintiff received the following email from Kristen E.
Northcutt, Deputy Director of KYOBA:

> "Your application to sit for the February 2016 KY Bar Exam has
> been referred to me for further review.  I noticed while reviewing
> your file that you are currently involved with the Florida Lawyers
> Assistance Program, more specifically, you are being monitored by
> Dr. [Redacted].  Can you please provide a medical release form for
> him? The sooner we receive this release form, the sooner I can
> move forward on your file…"

55.     On that same day, Plaintiff returned a third medical records release, signed and
notarized, via emailed PDF, to Northcutt granting complete access to FLAP monitoring records.

56.     On December 29, 2015, Plaintiff received an email from "NoReply@kyoba.org"
confirming that her supplemental application requirements were complete.

57.     On January 7, 2016, Northcutt emailed Plaintiff:

> "As you know, during the review process of your February '16 KY
> Bar Exam application, we sent out a letter to Dr. [Redacted] to

obtain a copy of your medical records from being treated by him. As of today, we have not received a copy of your records. I am unable to complete a thorough review of your application without these records. Is it possible for you to contact Dr. [Redacted] to inquire about the status of our request? The deadline to have this documentation into our office is 1/20/16.

I will be out of the office beginning tomorrow thru Tuesday, January 19th. I have copied your bar application analyst, Stephanie Thomas, on this email so that you can be in touch with her while I am out. Please respond to the both of us."

58.     On January 7, 2016, Plaintiff replied:

"Hello Ms. Northcutt and Ms. Thomas, I met with Dr. [Redacted] earlier this week and he said that he would be fulfilling the records request promptly so you should have them soon. I believe he was waiting on our appointment to talk with me beforehand. I will also call to double check that it is being handled.
Thank you."

59.     On January 15, 2016, Thomas responded that "[w]e have not received your records as of today."

60.     On January 15, 2016, Plaintiff, provided an individually-tailored letter from her psychiatrist to assure the KBA of her compliance with medical advice, prescription instructions and FLAP contract requirements. Plaintiff did so in order to avoid practice limitations, delays for further CFC investigation(s) and/or punitive sanctions from the KBA. The physician's letter stated that Plaintiff is compliant with treatments and expected to function professionally while under treatment without risk to herself or others.

61.     Under ADA guidelines pertaining to the depth of permitted inquiry, this physician's letter should have been sufficient to conclude the KBA's investigation. Despite this letter, the state defendants and its agents continued its investigation.

62.     On January 19, 2016, Plaintiff was required to send a broader medical records release form to Stephanie Thomas, KYOBA Application Analyst, which permitted the KBA access to inpatient records, outpatient records and treatment notes.

63.     On February 3, 2016, Deputy Director Kritsten Northcutt sent the following message to Plaintiff:

> This letter will serve as notice that you will be permitted to sit for the February 2016 Kentucky Bar Examination under Waiver pending a hearing before the Character & Fitness Committee. Your February 2016 bar examination results will remain sealed and will not be released to you unless and until you receive a favorable recommendation from the Committee certifying you from a **standpoint of character and fitness** for admission to the Kentucky Bar.
>
> Enclosed is a waiver for you to sign and return to our office within seven days of the date of this letter. You will receive formal notice of a hearing before the Committee as soon as a date has been set.
> If you have any questions regarding this matter, please feel free to contact me.
>
> (Emphasis added.)

64.     The attached waiver agreement read as follows:

> "KENTUCKY OFFICE OF BAR ADMISSIONS
> CHARACTER & FITNESS COMMITTEE
>
> BAR EXAMINATION DATE: February 23 & 24, 2016
>
> I _____ understand that I am being permitted to take the Kentucky Bar Examination even though the Character and Fitness Committee has not completed its character and fitness background investigation to determine my eligibility at this time.
>
> I understand that I will not be informed as to my bar results until such time as the Committee certifies to the Board of Bar examiners that I meet the character and fitness requirements set forth in SCR 2.011, and as provided for in SCR 2.040.
>
> I further understand that in the event that the Character and Fitness Committee does not certify me, my bar results will not be released and shall remain sealed."

65.     On February 8, 2016, having no other options, the Plaintiff signed and notarized the agreement, and returned it to KYOBA.

66.     On February 23 and 24, 2016, Plaintiff took the Kentucky Bar Examination in Lexington, Kentucky.

67.     On March 28, 2016 Plaintiff received a "consent agreement" for conditional admission from the KBA stating that she could not practice without, among other conditions, 1) a KYLAP agreement; 2) continued compliance with FLAP; 3) quarterly reporting to the CFC; 4) physician and treatment compliance; 5) proof of compliance submissions; 6) disclosures of information regarding "adverse incidences"; and 7) residency in Kentucky for the entire period of the agreement unless relocation is for employment and the KBA approves. Plaintiff had no option but to sign the agreement so she could practice law.  Plaintiff signed in good faith and sought to negotiate a fair agreement with KYLAP that would operate similarly to her existing FLAP agreement.

68.     On March 28, 2016, Plaintiff signed the conditional admission agreement, returned it to the KBA and contacted KYLAP.

69.     Plaintiff provided Hourigan with a copy of her FLAP agreement for use in crafting her KYLAP agreement and forwarded the January 15, 2016 letter from her physician to Hourigan's office.

70.     On March 28, 2016, the Plaintiff sent Hourigan the following email:

> "I am a recent Kentucky Bar Applicant with a prior bar license from Florida [redacted]. I have bipolar disorder, which has been maintained with my psychiatrist effectively since my diagnosis in 2014. I am currently in compliance with a contract with [FLAP] and see my [Dr.] [redacted].
>
> Since I am seeking admission to the Kentucky Bar, I have also been ordered to formulate an additional contract with your

organization in order to comply with conditions of admission to the Kentucky Bar.

I would appreciate your assistance in formulating a contract regarding the continued treatment with [redacted]. We have found my medications to be effective and I… remain optimistic that I'm on the right track.

I have attached the contract and letter received today from the bar. I will be signing and notarizing these documents for return within the ten day period required. I wanted to reach out to you ASAP to assure we have enough time to get the contract to the bar. I hope to hear from you soon.

I would appreciate your guidance on the next steps I need to take.

Thank you in advance for your assistance…"

71.     On March 28, 2016, Plaintiff called KYLAP and spoke with Program Administrator, Ashley Beitz, regarding her circumstances, and followed with an email with her FLAP agreement attached for Hourigan's review:

"Hi Ms. Beitz,

Thank you so much for taking a moment to talk to me about your program's contracts generally via phone.  As discussed, I'm attaching my clinical contract with the Florida Lawyers' Assistance Program. I was diagnosed Bipolar in 2014 following a manic attack that was due to use of an antidepressant prescribed by [redacted]. Thereafter, I was diagnosed Bipolar, and the bar sought to investigate [redacted] in 2014. Since that time, I've been committed to my health and under the care of [redacted], [redacted] in [redacted].

I look forward to speaking with you more about my contract with [KYLAP].

Thank you,
[Plaintiff]
Clinical Contract1.docx 22K (Attached)"

72.     On March 20, 2016, Beitz responded:

"Thank you, [Plaintiff]! I'll forward this to our director and I'll try to get back to you by the end of this week."

73.     On March 30, 2016, Hourigan wrote an email to Plaintiff requesting to "meet in person, if that is possible" and asked about Plaintiff's travel plans to major Kentucky cities.

74.     On March 31, 2016, Plaintiff replied that she was not scheduled to be in [Redacted] as she lived in [Redacted] but she would be available to drive out-of-town to meet if necessary. Plaintiff also suggested a video conference meeting as a possible option.

75.     Hourigan assured Plaintiff that her KYLAP agreement would be similar to her FLAP agreement, and would not limit work in and out of Kentucky. Hourigan further assured Plaintiff via telephone she would craft an agreement tailored to her diagnosis whereby Hourigan would be Plaintiff's monitor. Hourigan told Plaintiff that she could telephone/text her check-ins to comply with monitoring. Hourigan requested a copy of Plaintiff's FLAP agreement be emailed to her.

76.     On April 8, 2016, Plaintiff learned she had passed the Kentucky bar exam and tendered payment for prorated dues and the fee for the swearing-in ceremony scheduled in Frankfort for April 28, 2016 ($104.90).

77.     On April 13, 2016, after no word from Hourigan or KYLAP staff for two weeks, Plaintiff emailed Hourigan again to schedule the required in-person meeting and suggested dates for meeting. The Plaintiff and Hourigan agreed to meet prior to the swearing-in ceremony.

78.     On April 13, 2016, the parties verbally discussed the KYLAP agreement and how it would be crafted to mirror Plaintiff's FLAP agreement. The KYLAP agreement was to require no additional conditions nor monitors.

79.     Hourigan wrote that she "really just want[ed] to meet with [Plaintiff] and talk for a little while" and stated that she "would like to have the agreement prepared and to [Plaintiff] prior to our meeting". Hourigan again requested a copy of Plaintiff's FLAP agreement. Hourigan

stated that the meeting would not take long, and suggested the parties meet at 8:30 a.m. on April 28, 2016 at Plaintiff's Frankfort hotel.

80.     On April 14, 2016, Plaintiff received a response from Hourigan indicating that she did, in fact, previously receive the FLAP agreement, but she had forgotten she had received it. Hourigan also inquired regarding Plaintiff's FLAP monitor information.

81.     On April 26, 2016, Plaintiff had still not received the proposed KYLAP agreement as promised. Plaintiff emailed Hourigan to confirm the April 28, 2016 meeting.

82.     On April 28, 2016, Hourigan sent a text message that she would be at Plaintiff's hotel by 8:15 AM. Hourigan, thereafter, texted that she would be running late and that they would meet on the steps of the Capitol.

83.     Within minutes of her swearing-in, a discussion ensued, within earshot of other bar applicants between Plaintiff and Hourigan outside of the Capitol entry doors wherein Plaintiff was required to publicly discuss the KYLAP contract and Plaintiff's health matters with Hourigan. These matters should have been discussed in private.

84.     Hourigan presented a proposed KYLAP agreement that was not crafted as promised; requiring "random drug testing" and mouth swab testing for alcohol. Plaintiff has never had issues with drugs or alcohol. These, and other provisions, were unjustified.

85.     Plaintiff expressed objections and informed Hourigan that she would not sign the proposed agreement because it was boilerplate and reflected a KYLAP agreement for someone with drug and alcohol issues. Plaintiff also informed Hourigan that the agreement violated her rights under the ADA, that such conditions were unjustified, and the ADA does not permit the disabled to be treated like criminals.

86.     Hourigan indicated that the alcohol testing provisions were standard KYLAP conditions, and that her research showed that Plaintiff's prescribed medications required alcohol abstinence.

87.     One fellow applicant, hearing the discussion between Plaintiff and Hourigan, asked Plaintiff about the meeting. Plaintiff was again embarrassed and humiliated that her private information had been presented in a public forum.

88.     Pending a KYLAP agreement, Plaintiff was unable to practice law. Between April 28, 2016 and May 2, 2016, Plaintiff continued attempts to reach an agreement with Hourigan without success.

89.     On April 28, 2016, Hourigan requested a fourth medical records release from Plaintiff, and Plaintiff complied by sending a release to each Hourigan and her physician.

90.     On May 5, 2016, Plaintiff, hearing nothing, contacted Hourigan via email, stating:

> "Hi Yvette, I just wanted to write and check in with you to see if you had had a moment to speak with my doctor or get the documents necessary to redraft my contract. I'm anxious to start working as an attorney and I am aware that I cannot do so until I have signed that contract with you.
>
> If there is anything that I can do to expedite records or perhaps a request for Dr. [Redacted] to contact you, please just let me know and I will reach out to his office or send him an email. I hope you're having a great Derby week! [Redacted]".

91.     Between May 5, 2016 and May 10, 2016, Plaintiff and Hourigan exchanged emails regarding discussions with the doctor. Hourigan asked Plaintiff to have her physician contact her directly.

92.     Plaintiff arranged for a call between Hourigan and her physician on May 9, 2016. On May 10, 2016, Plaintiff sent Hourigan the following email:

> "Hello, Were you able to connect with Dr. [Redacted] yesterday? If needed, his office number is [Redacted]. Let me know if there's more I can do. Thanks, [Plaintiff]"

93.     On May 9, 2016, Plaintiff's physician called at the scheduled time, but Hourigan did not answer. He was forced to leave a message.

94.     On May 10, 2016, Plaintiff emailed Hourigan to check status, and Hourigan replied:

> "Hey [Plaintiff]. I was waiting for him to call me but he hasn't. I have been in and out of Louisville today for the convention and will be back there the rest of the week. I will call him tomorrow just to try to catch him or leave my number. It will be difficult to speak privately while I'm in Louisville but I can take time to talk to him if he has time. I will try to get with him tomorrow. Thank you. Yvette".

95.     During this time, Plaintiff lost several opportunities to work for private clients and law firms. Plaintiff was forced to leave a position at a private law firm wherein her continued employment required her to be eligible to practice.

96.     Plaintiff's physician and Hourigan discussed that he did not recommend the alcohol provision, as he did not see its necessity nor justification.

97.     On May 16, 2016, Hourigan refused to acknowledge the physician's opinion, and sent Plaintiff the following email:

> "I have had the opportunity to speak with Dr. [Redacted] regarding your use of alcohol while taking medications for treatment of bi-polar disorder. KYLAP's practice is to require abstinence when individual lawyers are being treated for mental health issues and particularly when any medications are being taken. Alcohol is contra-indicated for [Redacted]. I see no reason to deviate in this instance. Hence, the abstinence provision will remain in your supervision agreement with KYLAP. Please sign the agreement and return it to me at your earliest convenience. You may email a signed copy digitally, but please also return the original by mail. Dr. [Redacted]'s quarterly reports should begin effective July 1, 2016. For your convenience, another copy of the form he should submit is attached."

98.     Hourigan disregarded the physician's qualified opinion, and sought the imposition of boilerplate and punitive conditions without medical evidence. Hourigan acted in an illegal and intentionally discriminatory manner, and violated provisions of the ADA.

99.     On June 2, 2016, Plaintiff retained Peter Ostermiller to represent her in regard to Kentucky bar admissions.

100.    On June 6, 2016, Hourigan notified Lisa Larkey of KYOBA that Plaintiff was in violation of her conditional admission contract, requesting an order to show cause to punish Plaintiff for refusing to sign Hourigan's unlawful KYLAP contract. Hourigan wrote:

> "Dear Ms. Larkey:
>
> Please be advised that [Plaintiff] timely contacted me upon returning to Kentucky and submitting her application for Kentucky admission. We met on April 28, 2016, the morning of her swearing in ceremony in Frankfort.
>
> We reviewed the Supervision Agreement KYLAP had prepared in response to the request of the Office of Bar Admissions, after having reviewed her agreement with Florida. Ms. [Plaintiff] questioned some of the terms of the agreement, and asked that I speak with her treating psychiatrist in [Redacted], Dr. [Redacted], before she signed the agreement. With her [HIPAA]-compliant authorization, I spoke with Dr. [Redacted], and was satisfied with the content of the Supervision Agreement as written.
>
> I notified Ms. [Plaintiff] on May 16, 2016, that the agreement was appropriate pursuant to her medical diagnosis and my conversation with Dr. [Redacted]. A copy of the proposed agreement is enclosed. I did not receive a response. I e-mailed Ms. [Plaintiff] on May 24, 2016 and asked her to return the agreement if she hadn't already done so. Again I have received no response. I have not heard from Ms. [Plaintiff], and she has not responded to my e-mails. I have not received a signed copy of the Supervision Agreement. Ms. [Plaintiff] is not under KYLAP supervision at this time. Thank you for the opportunity to be of service. Please call me if you have any questions."

101.    On June 14, 2016, KBA General Counsel Feamster, wrote to Plaintiff:

"On March 29, 2016, you signed a Consent Agreement with the Character and Fitness Committee to be admitted to the Kentucky Bar on a conditional basis. You agreed to comply with the provisions set forth in that agreement. This letter is to inform you that now that you have been admitted to the Kentucky Bar, your Consent Agreement is now in effect and to remind you of your obligation to comply with that Agreement.

As of the date of this letter, you are out of compliance with your Consent Agreement as you have not yet returned a signed copy of your Supervision Agreement back to Yvette Hourigan, Director of [KYLAP]. You must submit a signed copy of the attached Supervision Agreement within 7 days of the date of this letter to Yvette Hourigan with copy to the Character and Fitness Committee. If no response is received from you, an order to show cause will be issued as to why your license should not be revoked. If you have any questions regarding this matter, feel free to contact me."

102.    Ostermiller initiated first contact with the KBA, and, on June 21, 2016, Feamster

replied to Ostermiller:

"Here is a copy of the consent agreement [Plaintiff] signed with this office, in case you do not have it. Also, please confirm with me that [Plaintiff] is not practicing. We can't have her practicing and arguing about a KYLAP agreement."

103.    Between April 28, 2016 and August 28, 2018, the Plaintiff was not practicing law

in the Commonwealth of Kentucky.

104.    On July 5, 2016, Ostermiller responded to Feamster:

"Dear Beth:

This letter is a follow up to my previous telephone call to you and our email exchange. I was retained by Ms. [Plaintiff] after she received your letter of June 14, 2016. Thank you for providing me an extension to respond to your letter on behalf of Ms. [Plaintiff].

I have conferred with Ms. [Plaintiff] regarding your letter and underlying matters. The core issue appears to be the KYLAP's request that the KYLAP Supervision Agreement concerning Ms. [Plaintiff] contain an abstinence requirement.

Such a condition would be beyond required in the resolution of the Florida disciplinary proceeding, and more importantly, would be beyond the treatment guidelines provided by Ms. [Plaintiff]'s treating physician, Dr. [Redacted], a psychiatrist practicing in [Redacted].

A number of the matters set out in this letter is background information and other information which has been provided previously by email and/ or by telephone conversations with KYLAP and the Kentucky Office of Bar Admissions, and information and documentation reflected in the material Ms. [Plaintiff] previously provided to the Character and Fitness Committee. However, I thought it appropriate to set out the framework regarding Ms. [Plaintiff's] physician, based on her treating physician's recommendations and guidelines, and the actual events which have occurred subsequent to the unfortunate events in 2014.

In particular, in 2014, Ms. [Plaintiff] was prescribed an anti-depressant. She received a serious adverse reaction to that prescribed medication causing a period of mania. That period of mania, ultimately diagnosed as a Bipolar I disorder, lasted for approximately four months. During that period, Ms. [Plaintiff] [redacted] was investigated by the Florida Bar and ultimately resulted in the diversion agreement with the Florida Bar. The diversion program in Florida included Ms. [Plaintiff's] participation in Florida's version of KYLAP with a Supervision Agreement, providing for monitoring.

Ms. [Plaintiff] has remained in full compliance with that diversion program and her Florida Lawyers' Assistance Program participation since that time. At all times, Ms. [Plaintiff] has been, and remains, under the care of a treating healthcare professional. Her current treating physician is Dr. [Redacted].

As set out in more detail below, Dr. [Redacted] has not required that Ms. [Plaintiff] abstain from the consumption of alcohol notwithstanding the medications which had been prescribed for her. Furthermore, her Florida Lawyers Assistance Program agreement does not require abstinence.

Ms. [Plaintiff] has not had any history of substance abuse or alcohol abuse or addiction. She also has no criminal record, [redacted] disclosed in Florida and now Kentucky. Ms. [Plaintiff] began treatment for the prescription-induced bipolar condition in August of 2014. Over the intervening years, Ms. [Plaintiff] has been prescribed different medications. In November of 2014, Ms.

[Plaintiff] was prescribed [redacted] for a bipolar disorder. Ms. [Plaintiff]... [Redacted]. She [redacted] under the care of Dr. [Redacted]. [Redacted] medications "may" cause drowsiness, and the warning label [redacted] indicate[s] that alcohol "may" make such drowsiness worse. No one person reacts the same way to any particular medication, as to type, dosage, frequency of use, etc.

Medication, the combination of medication, interactions with other medications, etc., are all factors which are appropriately left to the treating healthcare provider, in this case, Dr. [Redacted]. During the initial stage of [Plaintiff]'s treatment in 2014, from around September to December of 2014, she was prescribed medications different than her current medication. For that 2014 medication, she was expressly advised to abstain from consuming alcohol. Ms. [Plaintiff] had severe allergic reactions to those earlier medications, including difficulty in walking, major rashes requiring prednisone treatment, and involuntary tick and rocking movements.

Ms. [Plaintiff's] medications were eventually changed to her current medications, for which alcohol abstinence is neither required nor suggested. A certain level of alcohol consumption has been deemed medically acceptable, and Ms. [Plaintiff] has been advised that she was permitted to drink alcohol on occasion. [Redacted]. Ms. [Plaintiff's] compliance with [redacted]… she has not been a chronic alcohol abuser nor is she addicted to alcohol.

Her adverse health condition was caused not by poor lifestyle choices or improvident life choices. Instead, her adverse health condition was the result of an adverse effect from prescribed medication from 2014. As a result, Ms. [Plaintiff] has been, and remains, appropriately compliant with all treatment recommendations of her treating healthcare provider.

As you know, Ms. [Plaintiff] sought admission by examination in Kentucky in December of 2015. As part of that process, in late March of 2016, she entered into a Consent Agreement with the Kentucky Office of Bar Admissions. The relevant terms of that Consent Agreement included her continuing compliance with the Florida Lawyers' Assistance Program and her Florida diversion agreement, and for her to continue to see her treating physician and comply with the advice of her physician. She has at all times remained compliant with [FLAP], her diversion program in Florida, and she remains compliant with the treatment recommendations of Dr. [Redacted].

Another condition of that March, 2016 Consent Agreement was that Ms. [Plaintiff] was to contact KYLAP and to enter into a KYLAP Agreement. In particular, the Consent Agreement indicated that Ms. [Plaintiff] was to contact KYLAP and to discuss the terms of a KYLAP Supervision Agreement. Ms. [Plaintiff] made that contact and entered into discussions with KYLAP concerning the terms and provisions of a Supervision Agreement. Ms. [Plaintiff's] discussions with KYLAP began at the end of March of 2016, and continued into April of 2016. On April 8, 2016, Ms. [Plaintiff] was advised that she had passed the Kentucky Bar Examination.

On April 28, 2016, KYLAP tendered to Ms. [Plaintiff] a proposed Supervision Agreement. However, the KYLAP Supervision Agreement contained a term not required in her Florida Lawyers Assistance Program Agreement nor a condition required by her treating physician, Dr. [Redacted]. In particular, the tendered KYLAP Supervision Agreement contained an abstinence provision. However, there is no medical basis for that abstinence condition and such a condition is contrary to the advice and guidance provided by her treating healthcare provider, Dr. [Redacted]. The concern of Ms. [Plaintiff] regarding the position taken by KYLAP, is that the abstinence condition is based on the bipolar disorder diagnosis of Ms. [Plaintiff] and the nature of the medication she is taking. However, such a basis for an abstinence condition disregards or materially minimizes not only the medical opinion of Dr. [Redacted] that abstinence is not required, but is also inconsistent with the historical activity of Ms. [Plaintiff] without adverse incident, since 2014.

In particular, Ms. [Plaintiff], consistent with the treatment recommendations of Dr. [Redacted], has been able to safely and appropriately consume moderate amounts of alcohol as noted earlier in this letter.

In May of this year, as KYLAP continued to take the position that Ms. [Plaintiff]'s diagnosis and medication were sufficient to require abstinence, Ms. [Plaintiff] became concerned that the position of KYLAP ran afoul of the [ADA]. In particular, Ms. [Plaintiff] was concerned that a medically-unsupported condition to admission, which went beyond the directives of her physician, was a limitation on admissions of practice of law which may not be imposed on an applicant without violating the ADA.

As a result, in May of 2016, Ms. [Plaintiff] contacted the Department of Justice to make a complaint under the ADA. The undersigned has conferred with Ms. [Plaintiff], and it appears to

the undersigned that Ms. [Plaintiff]'s pursuit of such an administrative remedy is likely premature at this time since the proceedings before the Character and Fitness Committee remains a pending matter subject to a review by the Supreme Court.

However, the proposed imposition of an additional burden to admission not medically-supported, and the improper emphasis on a mental health condition, rather than the actual conduct of the person with the condition, is troubling. Ms. [Plaintiff] has also advised that the Character and Fitness Committee has requested that Ms. [Plaintiff] agree to a three year residency requirement should she obtain a license in Kentucky. I do not understand the legal basis for such a requirement. Ms. [Plaintiff] is licensed in Florida, and remains compliant with her diversion program from Florida.

And, although Ms. [Plaintiff] presently resides in [Redacted], Kentucky, she has also worked in other States. Furthermore, a residency requirement would appear to be inconsistent with the concepts of lawyer mobility, especially for an attorney who is already licensed in Florida. Ms. [Plaintiff] respectfully submits that her health condition, properly addressed with medication, and her moderate consumption of alcohol, which has occurred for a number of years, does not have any real or tangible effect on her ability to practice law. An abstinence requirement, beyond being outside of the recommendations of her treating healthcare provider, is also inconsistent with the long period of time Ms. [Plaintiff] has been on the current medications and consume alcohol in moderate amounts.

A quote from Julius Caesar seems particularly appropriate: "Experience is the teacher of all things." More to the point, Ms. [Plaintiff], having been on her medications for an extended period of time, while at the same time consuming moderate amounts of alcohol, all with the knowledge of her treating healthcare provider, Dr. [Redacted], shows that the concern of KYLAP in requesting an abstinence requirement is not reasonably necessary.

Ms. [Plaintiff] acknowledges that reasonable conditions would be appropriate for any applicant seeking admission to the practice of law in Kentucky. By a logical extension, unreasonable conditions and limitations would not be.

Under the facts of the present case and the law applicable thereto, an abstinence requirement is an unreasonable condition. Thank you for your consideration in this matter. Given KYLAP's involvement in the process of the conditions of Ms. [Plaintiff's] admission to

the practice of law in Kentucky, I have also forwarded a copy of this letter to Yvette Hourigan, Executive Director of KYLAP. If you or the Committee, for that matter, Ms. Hourigan, have any questions or require any additional information, please contact me."

105.    On July 15, 2016, via her counsel, Plaintiff sent an additional letter to the KBA

and Hourigan from her doctor. Plaintiff's physician wrote to Hourigan:

> "Dear Yvette, As you know, [Plaintiff] has been a patient treated through this office since August of 2014. She has been diagnosed with bipolar. Her medications include [redacted] at bedtime.
>
> She has been compliant with her medications. She has kept her follow-up appointments, faithfully. For the last several months, her clinical condition has been stable. Her moods and self-attitude have been neutral. Her thoughts have been well organized. She reports her sleep and appetite to be at baseline.
>
> There is no evidence of danger to self or others. She denies that she has had any problems with alcohol excess, past or present. No history of substance abuse has been elicited.
>
> Given her clinical stability over the last several months, this writer has indicated to the patient that she may have "a drink" of an alcoholic beverage in any given 24-hour. This writer has stressed the importance of moderation and advised the patient of risks of potential interaction between prescribed medications and alcohol.
>
> I hope that this information proves helpful to you in your determinations. If I may be of further assistance, or you have questions, please do not hesitate to contact me at your convenience."

106.    On July 19, 2016, Ostermiller provided the physician's letter to Feamster by email

attachment.

107.    On July 29, 2016, the KYLAP agreement was revised regarding alcohol

monitoring conditions, but the residency requirements, additional monitoring and additional

counseling appointment requirements remained in the combined agreements (conditional

admission and KYLAP). It provided that if Plaintiff changed residency for more than a week, she

"SHALL be subject to review and full compliance with all rules and regulations governing admission to the bar". The new proposed KYLAP agreement stated that Plaintiff must notify Hourigan if leaving town for business or pleasure for one week or more. After the prior dealings with Hourigan, Plaintiff felt assured that the residency condition would certainly pose problems, given that she had been prohibited from taking work in Kentucky for 3 months, and required out-of-state work to support herself.

108.    Unable to leave the state under the terms of the conditional agreement and suspended from the practice of law, Plaintiff volunteered at a non-profit center which receives Kentucky Bar Foundation ("KBF") grants, among other federal, state and local funding, to assist in refugee resettlement. Plaintiff's volunteerism lead to an offer for employment to teach basic introductory civics, safety and sewing courses to refugees for a low hourly pay through a KBF grant. The 2016 KBF grant was entitled, "Preventing Violence & Supporting Survivors in the Refugee & Immigrant Communities through Education, Legal Assistance & Job Readiness." In this job, Plaintiff would not perform legal tasks – the center's immigration attorney and her assistant were conducting those portions of work. The position required Plaintiff to organize courses, schedule translators and contact speakers/trainers for refugees to learn about dialing 9-1-1, CPR, avoiding arrests, minding domestic violence laws, getting children to school, obtaining medical insurance, going to doctors, getting vaccines, applying for public assistance, finding translators at the courthouse, job readiness, sewing, and other "basic" civics topics for new residents.

109.    In October of 2016, Plaintiff reported this position to the KBA. Thereafter, Feamster demanded Plaintiff to prove that she was not practicing law, and required the contact information for her new employers and managers.

110.    On November 7, 2016, Feamster notified Plaintiff via email that she must appear before the KBA's CFC for a formal hearing and that:

> "…the [CFC] is still requiring that you not practice law unless and until this matter is resolved in a fashion that allows you to do so."

111.    On November 15, 2016, Plaintiff emailed Feamster requesting a professional conversation in lieu of a costly hearing to discuss ADA objections and how the parties could resolve concerns on both sides.

112.    Plaintiff had been unable to practice for seven months after expending a great deal of money in application and exam costs, and could not afford the hearing fee.

113.    Feamster responded by email that the CFC was unwilling to accommodate Plaintiff's request, and that a hearing was mandatory, as well as a $750 bond. Again, she reiterated:

> "… [R]emember that you are precluded from practicing law in Kentucky while this matter is pending.  You are out of compliance with the terms of your conditional admission and may not practice in Kentucky at this time."

114.    In response to Plaintiff's request for time to afford the hearing, Feamster agreed that the hearing could be paid and scheduled after the 2016 holiday season. On November 29, 2016, Feamster also wrote to Plaintiff:

> "This is the follow up letter I referenced in my e-mail to you yesterday afternoon, at approximately 3:47 p.m. If for some reason you did not receive the e-mail, please advise immediately. I would appreciate it very much if you would acknowledge receipt of both yesterday's email and this letter which is being sent both electronically and through the U.S. mail. It has been twenty-four hours at this point and I have heard nothing from you.
>
> As I stressed yesterday, the Character and Fitness Committee is very concerned about the job you described in your e-mail of November 23, 2016. They want the documents detailed in my responsive e-mail as soon as possible, and they need to be received

in my office no later than noon, eastern time on Friday, December 2, 2016.

To reiterate, those documents include the following: the job description for the job you have at the [redacted], any advertisements for the position, the name of your supervisor as well as his/her contact information and a written description of how you learned about the job. The written description should include a summary of the hiring process including summaries of interviews in which you participated. The summaries must include the interviewer's name, and job title and contact information.

This is a very serious matter and the Committee takes this entire process, including your violations of your conditional admission, very seriously. The Committee serves as the Gatekeepers for the Profession and strictly complies with its obligations to the public. Do not ignore the communications and the need to respond with the documents requested.

Failure to heed this request can have serious adverse consequences. If you have any questions concerning this matter, feel free to contact me. I look forward to hearing from you and receiving the requested documentation."

115.    Under great stress at work and regarding the ongoing matters at the KBA, Plaintiff wrote a lengthy email hoping to provide Feamster enough information about her job to prevent the KBA from making calls to her bosses that would reveal her private health matters and ongoing issues with the KBA.

116.    Feamster responded with the following on December 1, 2016:

"This letter is in response to the multi-paged e-mail you forwarded me on Tuesday, November 29, 2016 at 11:02 p.m. While the communication from you was lengthy, it did not provide the documents I have previously told you the Character and Fitness Committee (hereafter "Committee") needs/requires.

You need to strictly, and quickly, comply with what has been requested. A telephone call with me will not in any way resolve your situation. You must produce the documentation requested, and any further documentation you believe will assist your situation and you must do it quickly.

If you do not produce all of the information requested, the Committee will be filing a motion with the Supreme Court of Kentucky to immediately suspend or revoke your conditional admission for on-going non-compliance with the terms of the admission and with your obligation to not practice law in this state unless and until all matters concerning your conditional admission have been resolved.

As I have repeatedly stressed, the Committee is very concerned about the job you described in your e-mail of November 23, 2016 and that concern was increased after reading your e-mail of November 29, 2016. They still want the documents detailed in my earlier e-mail and letter as soon as possible. After receipt of those documents they will make a determination as to how quickly a hearing needs to be scheduled. Because I was unable to get back in touch with you yesterday, and out of an abundance of fairness, the deadline for your detailed document production is extended. The documents, in their entirety must be received in my office no later than noon, eastern time on Monday, December 5, 2016.

To again reiterate, those documents include the following: a complete job description for the job you have at the [redacted], any advertisements for the position, the name of your supervisor as well as his/her contact information and a written description of how you learned about the job. The written description should include a summary of the hiring process including summaries of interviews in which you participated. The summaries must include the interviewer's name, and job title and contact information.

Further, since you referenced "[redacted name]" and "[redacted name]" as well as [redacted name], please have those individuals write letters to the Committee detailing the job you are performing, the requisites for that job, whether a law license is required for the job, what you have explained to each of them about your "issues" with the Office of Bar Admissions and the extent of your contact with the public.

In any Character and Fitness proceeding, the burden is on the Applicant (you) to prove that they are in compliance. It is your burden of proof, and it is a strict and stiff obligation. I will not be calling anyone or making an effort to undertake this burden for you.

As I have previously stated to you, this is a very serious matter and the Committee takes this entire process, including the on-going violations of your conditional admission, very seriously. If you have any questions concerning this matter, feel free to contact me.

I look forward to hearing from you and to receiving the requested documentation."

117.   Plaintiff left her job and was admitted to a hospital on December 7, 2016 under the financial, reputational and emotional stress of her circumstances.

118.   Plaintiff sent an email to Feamster on February 16, 2017 to discuss a hearing before the CFC and to provide the bond payment.

119.   The hearing was scheduled for April 27, 2017.

120.   On April 14, 2017, an updated *Second* Order to Show Cause was sent to Plaintiff.

121.   On April 27, 2017, the formal hearing was held. Plaintiff appeared without counsel, as she was unable to afford representation, to express her concerns with the KBA's ADA noncompliance. She hoped to negotiate changes to the conditional admission and KYLAP (proposed) agreements that would not inhibit her work in and out of state, nor require strict, unwarranted monitoring, additional medical treatment and intrusive chemical testing.

122.   The CFC initially had an impression that Plaintiff had violated the law, but Plaintiff explained that the conditional admission was predicated upon her bar application disclosures regarding her mental health treatment history. Plaintiff explained the breakdown in KYLAP negotiations and concerns regarding Hourigan's unprofessional behavior. Plaintiff sought to address the effects of the residency requirement, and discussed national standards for ADA compliance in state bar associations.

123.   Plaintiff requested unconditioned admission, as she was dutifully attending to doctor recommendations and FLAP conditions, and would be bound to report ordinary misconduct under regular bar membership guidelines.

124.   Susan C. Lawson of the CFC cross-examined Plaintiff regarding her signed conditional admission agreement line-by-line. Plaintiff expressed that terms in the agreement

were questionable under the ADA. Grant Helman, chair of the CFC, interrupted Plaintiff's attempts to negotiate ADA-compliant terms, making points about how Plaintiff should sign a conditional admission agreement to be monitored for ethical violations.

125.     Feamster did not raise conduct or behavioral concerns to justify a conditional license in this matter. Feamster discussed only Plaintiff's Bipolar I Disorder diagnosis, treatment and private medical records.

126.     Feamster falsely stated that the conditional admission and KYLAP agreements did not have residency requirements, and falsely denied that Plaintiff and her attorney had questioned residency requirements prior to the hearing. Feamster stated that the provisions of Plaintiff's conditional agreement were "standard" in all such agreements. In response to Plaintiff's questions to Feamster regarding ADA-compliance concerns, Feamster stated, "it was irrelevant because [Plaintiff] already signed it." Feamster instructed David Sloan of the CFC, that the terms of the agreements were boilerplate and Plaintiff would have to accept them as all conditioned attorneys do. At the close of the hearing, Plaintiff expressed concerns to Sloan about her confidentiality as these matters continued, and he instructed that Plaintiff's file would be confidential so long as she did not challenge the CFC in the SCOKY. Sloan asked Plaintiff to agree to that confidentiality term, and Plaintiff stated that she was unaware of the appropriate rules in that regard and would not agree.

127.     On May 22, 2017, Feamster notified Plaintiff that the CFC was recommending SCOKY to permanently revoke Plaintiff's license, and that she was drafting the opinion of the CFC to present to the high court. From May 22, 2017 to May 30, 2018, the Plaintiff requested an order via emails and calls to Feamster, but Feamster was nonresponsive.

128.     Throughout June, Plaintiff sought counsel to represent her in the SCOKY with regard the expected revocation order.

129.    On July 11, 2017, hearing nothing, Plaintiff wrote to Feamster for a status with regard to her bar license, as she was "active and in good standing" on the KBA's public website.

130.    On July 29, 2017, Plaintiff was billed for KBA membership dues, and paid $227.70 forthwith.

131.    From September of 2017 to January of 2018, Plaintiff corresponded with Feamster, as well as Mary Beth Cutter and Leona Deleon in the KBA's Continuing Legal Education (CLE) for extensions of time and clarification of requirements in light of Feamster's suspension orders.

132.    On January 3, 2018, Plaintiff requested an exemption to the New Lawyer Program ("NLP") as an attorney with practice experience "in another jurisdiction for a minimum of five years." Plaintiff was denied and attended the NLP on January 25 and 26, 2018.

133.    Plaintiff still did not receive a status from Feamster. Plaintiff left several follow-up messages for Feamster on her voicemail and via Stephanie Thomas, Application Analyst at the KBA/KYOBA.

134.    On March 6, 2018, Thomas emailed Plaintiff confirming she forwarded her March 2, 2018 message to Feamster.

135.    Since Plaintiff's swearing-in ceremony and bar number receipt on April 28, 2016 in Frankfort, she continually appeared on the KBA's public website as an attorney with full practice capability, listed in "good standing". However, she had to turn away private clients and explain why she could not assist in Kentucky cases.

136.    In April of 2018, Plaintiff registered for CLE courses for $250 as required by Cutter and Deleon. She also ordered a replacement copy of her bar card for $10 on the KBA website to see if she was internally noted as suspended. However, Plaintiff received the card

stating she was still a member, "in good standing", within a week. Feamster still had not responded to requests for status.

137.    On April 26, 2018, Thomas emailed Plaintiff to see if Plaintiff had heard from Feamster. Plaintiff responded that she had not.

138.    Plaintiff completed CLEs for KBA requirements in May of 2018.

139.    On May 30, 2018, 389 days after her formal CFC hearing, Feamster emailed Plaintiff:

> "The Character and Fitness Committee has requested that I contact you and ask you to appear at a follow-up Informal Hearing with them to discuss your current status and obtain an update from you. They are available on either July 5 or July 6, 2018 at the office on Newtown Pike in Lexington.  An Informal Hearing does not have a court reporter or any of the trappings of a formal hearing.  It is simply a meeting between you and the Committee. I look forward to hearing from you about this request."

140.    On June 1, 2018, Plaintiff received notice from the Florida Bar and FLAP that her monetary and monitoring conditions were met, and diversion was concluded. In closing out her file, Plaintiff's physician/monitor remarked that he had no concerns regarding her mental health and encouraged her to continue practicing law.

141.    On July 6, 2018, Plaintiff attended the informal hearing where she was questioned by the CFC regarding her disability. At the close of the hearing, Plaintiff hand-delivered the most recent physician/monitor letter and the Florida Bar's release to the CFC and Feamster.

142.    On July 12, 2018, Plaintiff received an email from Feamster:

> "The Character and Fitness Committee (hereafter "the Committee") would like to thank you for appearing and meeting with them on Friday, July 6, 2018. The Committee also acknowledges receipt of the letter from The Florida Bar providing that you have successfully completed all the terms and conditions associated with your diversion there and that your file with Florida has now been closed.

However, the Committee was very concerned to learn about a hospitalization for bi-polar issues that you testified was approximately a month in duration commencing in early December of 2016. At that time, you had already entered the Consent Agreement which clearly and specifically required you to notify the Committee of any incident or occurrence that could be considered adverse to a finding of either good moral character or fitness to be a practicing attorney. Yet, you did not notify the Committee of this hospitalization prior to or in your first hearing, on April 27, 2017, nor at any time thereafter until specifically asked during the recent informal hearing of July 6, 2018. This lengthy hospitalization, and your failure to disclose any information about it until last week, causes great concern about both your stability and your fitness to practice.

The Committee specifically requests that you obtain from your physicians and therapists the following documentation and forward it to the Office of Bar Admissions within thirty (30) days of the receipt of this letter:

- Certified copy of all of your medical and therapy records for the period from November 2016 until the present
- Certified copies of any and all hospitalization records from November 2016 until the present
- Updated Kentucky criminal history record
- Updated Kentucky driving record

The Committee needs to review all of your recent records: medical, psychological, psychiatric, general counseling of any type as well as your updated driving and criminal histories prior to making any determination or proceeding any further in this matter. Following this review, in all likelihood the Committee will require that you obtain a psychological evaluation of your current fitness to practice from a medical professional of the Committee's choosing before any decisions can be made on the status of your license.

Upon receipt of this letter, please email me so that I can accurately compute the thirty (30) day period for production. The burden is on you to contact your providers and hospitals to obtain and have forwarded complete certified copies of the requested documentation."

143.   On August 13, 2018, Plaintiff responded:

"I hope this letter finds you doing well.

I am writing in response to your July 12, 2018 letter indicating that more information regarding my medical diagnosis, treatment and very personal medical records are required for character and fitness investigation.

You also indicated that an independent medical professional evaluation was likely at the choosing of the character and fitness committee as well.

I believe that your requests are illegal under the [ADA]. I ask that you please review the Department of Justice's 2014 settlement agreement with the Louisiana Supreme Court which indicates that the questions in which you were asking on the application for admission are not advisable and the information that you have elicited (and continue to request) is beyond the allowable inquiry and not necessary as I have already provided 3+ letters from my independent medical professionals regarding their professional opinion that I am mentally able to practice law without concern for public safety.

You have suspended my ability to practice law in Kentucky since my admission to the bar on April 28, 2016. You have further impacted my ability to work out of state or on federal issues within the state while operating under your very punitive and restrictive conditions. I believe you have intentionally discriminated against me and similarly situated applicants. You are exhibiting deliberate indifference to my rights as a disabled person to live a normal life and practice my trade to support myself equal to other applicants.

I ask that you please respond in a timely manner. I feel that I am entitled to unconditional admission to the bar immediately as well as compensation for damages.

Please advise."

144.   On August 17, 2018, Feamster refuted receipt of Plaintiff's physician letter(s):

"In reviewing your email of Monday, August 13, 2018, I notice that you reference that "I have already provided 3+ letters from my independent medical professionals regarding their professional opinion…'. Our files only indicate a letter from Dr. [Redacted] which indicates that as long as you continue treatment and take your medication you should be fine, and a follow up letter from Dr. [Redacted] to Yvette Hourigan concerning his opinion that it was permissible for you to consume one alcoholic beverage per day.

I do not know if other letters were perhaps sent to Florida and you believe we are in possession of them, but we are not and we have no other letters.  Please let me know what other communications you are referencing. I look forward to hearing from you."

145.    On August 21, 2018, Plaintiff replied,

"I am writing to confirm I've received your email regarding questions/specifics on medical records. I am working on a response and will compile a timeline of disclosures and releases for you soon.

Most recently, I hand-delivered to Stephanie Thomas two letters (one from the Florida Bar re: my release from diversion and one from [Redacted], my… physician) at our July 6, 2018 informal hearing in Lexington at your office.

Additionally, Dr. [Redacted] has provided you and Ms. Hourigan at least two letters in addition to the numerous medical records releases I've provided since those accompanying my application in December of 2015.

Could you please tell me a status with regard to my ability to practice law in Kentucky?"

146.    On August 22, 2018, Feamster located the letter Plaintiff hand-delivered on July

6, 2018, emailing:

"Thank you very much for bringing the letter of Dr. [Redacted] to my attention.  I had not previously seen it and did not realize that you had delivered it to the office with the Florida bar release.

I had asked the staff to watch for the release and to please bring it to me and I received and reviewed that document.

The letter from Dr. [Redacted] must have gone directly into the file.

I have forwarded a copy of this letter to the members of the Character and Fitness Committee this morning and requested that they review it. The Committee will be in the office for a hearing this coming Tuesday.  While they are in the office they will discuss your status at that time and with the benefit of Dr. [Redacted]'s letter.

I will be in touch with you on Tuesday.

I also want to clarify a point.  You referenced the medical records releases you have previously executed.  This office has not sought any records of yours prior to the request last month and have no medical records whatsoever for you.

We have the letter Dr. [Redacted] sent in early 2016 and a copy of the letter he sent to Yvette Hourigan advising that you could have a drink a day.  That was all we had other than your statements. I will be in touch on Tuesday."

147.    On August 28, 2018, Feamster emailed, "[a]ttached please find a letter the Committee requested I forward to you releasing you from any conditions on your licensure. The original of this communication has been placed in the U. S. mail." The attached PDF on KYOBA letterhead listing the CFC and KBBE members stated:

"The Character and Fitness Committee (hereafter "the Committee") met today to discuss a variety of matters, including your recent request for unconditional admission in Kentucky. As I previously mentioned to you in the email of August 22, 2018, I forwarded the Committee Dr. [Redacted]'s letter as soon as I was aware of its existence.

With the clear opinion of a recent treating physician, as well as the release from your conditional admission in Florida, the Committee is satisfied and your request is granted. There are no restrictions or conditions on your Kentucky licensure.

If you have any additional questions, please do not hesitate to contact me."

148.    Plaintiff's Florida license has never been "conditioned" as stated in the above-quoted correspondence.

149.    On August 31, 2018, Plaintiff requested damages again via email to Feamster regarding her deliberately indifferent and intentionally discriminatory acts.

150.    On September 4, 2018, Feamster and Plaintiff arranged to meet regarding Plaintiff's damages claim.

151.    On September 7, 2018, Plaintiff met with Feamster and Sloan at the law offices of Bingham, Greenebaum and Doll in downtown Louisville, wherein they denied responsibility for damages Plaintiff suffered in this matter.

152.    Plaintiff retained counsel for the filing and prosecution of this action, and is entitled to recover attorney fees, expert fees, costs and expenses incurred in this case.

153.    Upon Plaintiff's request and payment of a $20 processing fee, the state defendants and its agents produced a copy of Plaintiff's original bar application and supplemental materials to Plaintiff on December 3, 2018. To date, Plaintiff's official bar files contain confidential and protected health information and multiple orders to show cause which reference her disability and treatment as character and professional flaws. The Plaintiff's official KBA files contain no notation that the orders to show cause have been dismissed.

## COUNT I: VIOLATIONS OF TITLE II OF THE ADA

154.    Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

155.    Congress enacted the ADA in 1990 to address, among other things, discrimination against persons with disabilities in public services (Title II), in order "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities…" because "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem".

156.    Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

157.    The ADA definition of a "public entity" includes state and local governments, as well as their agencies, agents and instrumentalities.

158.    Congress has expressly abrogated the states' Eleventh Amendment immunity to ADA liability providing that "[a] state shall not be immune… from an action in Federal or State court of competent jurisdiction for a violation of this chapter".

159.    Congress has delegated the Department of Justice ("DOJ") to promulgate regulations to implement the broad anti-discriminatory language of Title II. DOJ regulations implementing Title II are to be read in conjunction with the ADA pursuant to statutory directive.

160.    The DOJ's regulations directly apply Title II to the licensing and regulation of attorneys in state bar associations.

161.    A core purpose of the ADA is the elimination of barriers caused by the use of stereotypic assumptions "that are not truly indicative of the individual ability of [persons with disabilities] to participate in, and contribute to, society."

162.    A public entity cannot impose or apply "eligibility criteria that screen out an individual with a disability ... from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."

163.    Qualification standards based on a disability are illegal unless such qualifications are equally applied to all applicants, related to the job at issue and consistent with business necessity.

164.    Policies that "unnecessarily impose requirements or burdens on individuals with disabilities that are not placed on others" are prohibited by the ADA.

165.    A state bar association's professional licensing procedures should not be "arbitrary, capricious or plainly contrary to statute."

166.    Unnecessary hurdles in the path of a person with a disability violate the ADA.

167.    Individuals who are otherwise qualified for state bar admission may not be relegated to a separate admissions status solely on the basis of their mental health diagnosis.

168.    Conditionally admitting an applicant because of his or her mental health diagnosis violates the ADA.

169.    The SCOKY, KBA, KBBE, KYOBA, CFC, KBG, and KYLAP are "state entities" (collectively "state defendants") subject to the non-discrimination provisions of Title II of the ADA and its sweeping prohibition of practices by public entities that discriminate against persons with disabilities.

170.    The state entities and their agents govern the licensing and regulation of attorneys.

171.    Elizabeth Feamster and Pamela Yvette Hourigan are officials whose acts reflect governmental policy. Thus, the state defendants act through these agents.

172.    Grant Helman, Susan Lawson, Gary Payne and David Sloan are officials whose acts reflect governmental policy. Thus, the state defendants act through these agents.

173.    Kristen Northcutt, Lisa Larkey and Stephanie Thomas are officials whose acts reflect governmental policy. Thus, the state defendants act through these agents.

174.    Title II's enforcement provision incorporates by reference § 505 of the RA, 92 Stat. 2982, as added, 29 U.S.C. § 794a, which authorizes private citizens to bring suits for money damages.

175.    Persons with disabilities are "qualified" if they, "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."

176.    The Plaintiff is a qualified individual with a disability under Title II of the ADA, and/or she is "regarded as having a disability" by the state defendants and its agents.

177.    The state defendants, via its agents, inquire and investigate disabled attorneys in a manner which is not rationally related to the state entity's purposes.

178.    The state defendants and its agents, in violation of Title II of the ADA, utilize "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination".

179.    The state defendants' licensing scheme, and its agents' investigations, substitute an impermissible inquiry into the status of disabled applicants for a proper inquiry into the applicant's conduct, forcing qualified applicants to reveal personal and embarrassing information that is not relevant to their fitness to practice law.

180.    The state defendants' application questions regarding mental health treatment unlawfully screen individuals with disabilities, based on stereotypes and assumptions about their disabilities.

181.    The state defendants' and its agents' application inquiries are unnecessary, overbroad and burdensome.

182.    The application questions are unnecessary to assess applicants' fitness to practice law and the questions unlawfully subject applicants with disabilities, or perceived disabilities, to additional burdens.

183.    The state defendants and its agents imposed and applied eligibility criteria that screened out Plaintiff, and other similarly situated applicants, from fully and equally enjoying KBA services, programs and activities on the basis of actual or perceived disability.

184.    Agents of the state defendants, including but not limited to, Feamster, Hourigan, Northcutt, Thomas, Larkey and agents of the CFC, disregarded federal law, and diverted

Plaintiff's application for investigations and conditional licensure after Plaintiff revealed her disability.

185.    The state defendants and its agents violated the ADA when it conditioned the admission of Plaintiff without a conduct or behavioral justification.

186.    The state defendants and its agents violated the ADA when it conditioned Plaintiff's bar admission with no rational or reasonable justification therefore.

187.    The state defendants and its agents, including members of the CFC, violated the ADA by requiring the Plaintiff to enter into a conditional licensing and KYLAP contracts because of her disability, or perceived disability.

188.    The state defendants and its agents violate the ADA by targeting individuals for intrusive investigations, interfering with the confidentiality of their medical records, and imposing additional financial costs on applicants due to mental health diagnoses or treatment.

189.    The state defendants and its agents violated the ADA when it required Plaintiff to disclose and release broad medical records to the KBA, including intimate treatment notes.

190.    The state defendants and its agents violated the ADA by conducting an expensive, burdensome and unnecessary investigation of Plaintiff at her expense.

191.    The state defendants, and its agents, including Feamster and Hourigan, violated the ADA by imposing additional burdens on Plaintiff, an applicant with a qualifying disability, that are not imposed upon applicants without disabilities.

192.    The state defendants, and its agents, including Feamster and Hourigan, refused to amend agreements after Plaintiff, and her counsel, notified them of ADA-non-compliance.

193.    The state defendants, and its agents, including Feamster and Hourigan retaliated against Plaintiff.

194.     The state defendants, and its agents, including Feamster and Hourigan, violated the ADA in failing to afford considerable weight to Plaintiff's treating physician's statements.

195.     The state defendants, and its agents, including Feamster and Hourigan, violated the ADA by continuing its investigation after Plaintiff provided sufficient medical expert statements establishing she was cleared for practice with no reason for public or personal safety concerns.

196.     The state defendants, and its agents, including Feamster, the CFC, and Hourigan, violated the ADA when it required Plaintiff to appear for formal and informal hearings to be questioned on her disability and treatment.

197.     The state defendants, and its agents, including Feamster and Hourigan, absent evidence suggesting Plaintiff was a threat to the public or herself, violated the ADA by requiring Plaintiff to submit to weekly monitoring, reporting to the CFC and KYLAP, substance testing, psychiatric evaluations and treatment (beyond medical advice), financial requirements (bonds, monitoring and testing fees, copays, document requests), embarrassing employment disclosures, residency requirements, healthcare and hospitalization reporting, and other conditions based upon the defendants' speculative assumption that Plaintiff may pose a risk to the public because of her disability.

198.     The state defendants' and its agents' policies and practices, as applied to disabled applicants, fail to protect the confidentiality and freedom of practice enjoyed by non-disabled bar members, and carries a high likelihood of negatively impacting the reputation of the member.

199.     The state defendants and its agents violated the ADA when it demanded to correspond with Plaintiff's employers and medical providers about ongoing matters with her admission process and disability.

200.   The KBA's licensing scheme, investigations and conditional admissions procedures do not rationally relate to an applicant's ability to practice law. Evidence does not exist that mental health treatment has a negative effect on one's fitness to practice law.

201.   Psychological examinations at an applicant's expense have been ruled illegal under the ADA, because they "amount to a burden to which the vast majority of [the applicant's] classmates and other applicants were not subjected."

202.   The state defendants and its agents, including Feamster and Hourigan, violated the ADA when it suspended Plaintiff from practice for requesting ADA-compliant conditional admission and KYLAP agreements.

203.   The state defendants and its agents violated the ADA, and continue to violate the ADA, in failing to keep Plaintiff's membership files, and the health-related information therein, strictly confidential from public or inter-office access.

204.   The state defendants and its agents violated, and continue to violate, Plaintiff's constitutionally protected liberty interests in the privacy of her highly personal medical records.

205.   The state defendants and its agents continue to violate the ADA by permitting Plaintiff's confidential health information and bar files to be discoverable as part of her public bar records.

206.   The state defendants' and its agents' cause disabled lawyers' to be limited in employment opportunities by allowing their prospective employers, colleagues and clients to access information about their disability to which they would not ordinarily be entitled.

207.   The state defendants, its agents, including Hourigan and Feamster, have harmed, and continue to harm, Plaintiff's reputation.

208.    The state defendants and its agents violate the ADA by punishing disabled applicants, not based on actual risks, but based upon stigma, ignorance, speculation, stereotypes and/or generalizations about individuals with disabilities.

209.    The state defendants and its agents created, and continue to create, a chilling effect that deters individuals with disabilities from pursuing the legal profession or lawyers from seeking treatment.

210.    The state defendants' and its agents' admission and membership policies and procedures violate the ADA by deterring attorneys from obtaining necessary medical care for fear of stigma and punishment. The state defendants and its agents deter members and applicants from seeking diagnosis, counseling and/or treatment for mental health concerns, which, ultimately, fails to serve the state entity's interests of ensuring the fitness of licensed attorneys.

211.    The state defendants and agents, including Feamster and Hourigan, violated the ADA by subjecting Plaintiff to a license suspension for 853 days and forbidding her legal practice of federal law within the state with her Florida bar license.

212.    The state defendants and agents, including Feamster and Hourigan, offended Plaintiff's equal protection and due process rights when suspending her license, a constitutionally protected liberty and possessory interest, in retaliation for raising ADA concerns with their admissions procedure.

213.    The state defendants and agents, including Feamster and Hourigan, violated Plaintiff's due process and equal protection constitutional rights by jeopardizing and suspending Plaintiff's Kentucky bar license without timely and adequate substantive and procedural due process.

214.    The state defendants and agents, including Feamster and Hourigan, intentionally discriminated against Plaintiff, a qualified individual with a disability, from participation in equal

bar membership because of her disability by requiring burdensome, expensive requirements for membership of Plaintiff that are not applied to non-disabled applicants.

215.    The state defendants and agents, including Feamster, Hourigan, members of the CFC, Larkey, Thomas, and Northcutt took actions against Plaintiff because of her disclosed disability, and unlawfully directed investigations and disciplinary proceedings which led to Plaintiff's license suspension, loss of livelihood, loss of reputation and other damages.

216.    Animus against Bipolar bar applicants and members was the central factor for the position taken by the state defendants and agents, including Feamster and Hourigan.

217.    The state defendants and agents, including Feamster and Hourigan, have no legitimate, nondiscriminatory reason for its conditional licensing schemes applied to disabled applicants, and Plaintiff individually.

218.    The state defendants and agents have been on notice for at least 25 years that their admissions system is admonished by federal law, and a more integrated setting can be easily accomplished with reasonable modifications to the state defendants' programs and services.

219.    At all times herein, Plaintiff made the state defendants and agents, including Feamster and Hourigan, aware of their ADA violations, yet the defendants continued to discriminate against Plaintiff on the basis of her disclosed disability.

220.    State defendants and agents, including Feamster and Hourigan, were on notice, prior to 2015 and since investigating Plaintiff's application, that their discriminatory investigations and punitive treatment of disabled applicants are unlawful under the ADA. Plaintiff raised ADA-based objections throughout her application process, investigation and subsequent suspension, independently and via counsel.

221.    The actions of the state defendants and its agents, including Feamster and Hourigan, constitute discrimination in violation of, among other statutes, Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations, 28 C.F.R. Part 35.

222.    At all times pertinent to this complaint, the state defendants and its agents, including Feamster and Hourigan, have taken discriminatory actions against Plaintiff in a willful and intentional manner with conscious disregard of federal and state regulations.

223.    State defendants and its agents, including Feamster and Hourigan, caused Plaintiff to suffer irreparable damages that cannot be adequately compensated through remedies of law.

224.    The Eleventh Amendment does not bar a finding of intentional discrimination, discriminatory animus and deliberate indifference to justify a punitive damages award to Plaintiff.

225.    Pursuant to 42 U.S.C. § 12188, this Court is vested with authority to grant the relief for which Plaintiff herein requests.

226.    Under the terms of the Civil Rights Act of 1991 (1991 Act), 105 Stat. 1071, punitive damages are available in claims under the ADA, 104 Stat. 328, 42 U.S.C. § 12101, 12132 et. seq. Punitive damages are appropriate here because the state entity, and its agents, have engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."

### COUNT II: VIOLATION OF § 504 OF THE REHABILITATION ACT

227.    Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

228.    The Rehabilitation Act of 1973 (RA) § 504, 29 U.S.C. § 794, prohibits state entities and its agents from discriminating against persons with disabilities, because of their disability.

229.    The SCOKY, KBA, KBBE, KYOBA, CFC, KBG, and KYLAP are "state entities" (collectively "state defendants") subject to the non-discrimination provisions of Title II of the ADA and its sweeping prohibition of practices by public entities that discriminate against persons with disabilities.

230.    Elizabeth Feamster and Pamela Yvette Hourigan are officials whose acts reflect governmental policy. Thus, the state defendants act through these agents.

231.    Grant Helman, Susan Lawson, Gary Payne and David Sloan are officials whose acts reflect governmental policy. Thus, the state defendants act through these agents.

232.    Kristen Northcutt, Lisa Larkey and Stephanie Thomas are officials whose acts reflect governmental policy. Thus, the state defendants act through these agents.

233.    Like the ADA, §504 of the RA similarly prohibits state entities and its agents from discriminating against individuals with disabilities, and requires that they provide services and support in the most integrated setting appropriate to the needs of individuals with disabilities.  29 U.S.C. § 794, 45 C.F.R. § 84.4. The nondiscrimination rule of §504 of the RA applies to services provided by any "public entity" (without regard to whether the entity is a recipient of federal funds). The RA's implementing regulations provide that state entities and its agents "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d); see also 45 C.F.R. § 84.4.

234.    Discrimination on the basis of disability is prohibited by §504 of the RA, 29 U.S.C. § 794(a): "No otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity…."

235.    The state defendants and its agents are a "state entity" that discriminates against "qualified individual[s] with a disability" in violation of §504 of the RA and its implementing regulations.

236.    The State defendants and its agents administer programs and services for individuals with disabilities in a manner that denies individuals the opportunity to receive services in the most integrated setting appropriate to their needs.

237.    Plaintiff is a qualified individual with a disability, as defined by §504 of the RA, and Plaintiff is qualified to receive services in a more integrated setting.

238.    Providing membership to Plaintiff, and similarly situated applicants, in a more integrated setting could be accomplished with reasonable modifications to the Defendants' programs and services. In fact, 36 other state bars' procedures and practices, DOJ orders and ABA recommendations could be referenced for modifications to the KBA's procedures to conform to the ADA. Most states do not conduct admissions inquiries, investigations and conditional licensing schemes that violate the ADA.

239.    The RA §504 prohibits an otherwise qualified attorney with a disability from being excluded from the practice of law and the benefits of bar membership, or subjected to discriminatory treatment, as a result of their disclosing of a disability or mental illness treatment in their application for admission.

240.    The acts and omissions of the state defendants and its agents, including Feamster and Hourigan, constitute discrimination in violation of §504 of the RA, 29 U.S.C. § 794, and its implementing regulations, 45 C.F.R. § 84.4.

241.    The state defendants and its agents, including Feamster and Hourigan, violated the Plaintiff's rights under the RA on the basis of her disability.

242.     The state defendants and its agents, including Feamster and Hourigan, acted deliberately and intentionally to discriminate and punish Plaintiff because of her disability disclosures.

243.     The State defendants and its agents, including Feamster and Hourigan, intend to exclude disabled members and applicants, and jeopardize the licensure of professionals who seek medical help.

244.     The state defendants and its agents, including Feamster and Hourigan, acted in reckless disregard for Plaintiff's rights.

245.     The state defendants were on notice of Plaintiff's ADA-related objections her 853-day license suspension, but its agents and officials disregarded relevant concerns and retaliated with deliberate indifference.

246.     The state defendants and its agents, including Feamster and Hourigan, acted with deliberate indifference to Plaintiff's right to equal treatment in the admissions process.

247.     Plaintiff has suffered damages due to the actions and inactions of the state defendants and its agents, including Feamster and Hourigan.

248.     Plaintiff is entitled to compensatory and punitive damages in this matter.

249.     Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action and is entitled to recover those attorney fees, expert fees, costs and expenses incurred in this case from the Defendants pursuant to 29 U.S.C. § 794(b).

## COUNTS III - V: DUE PROCESS, ACCESS TO THE COURTS AND EQUAL PROTECTION VIOLATIONS

250.     Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

251.     Plaintiff's bar licenses are "livelihood, liberty and property interests" protected by the U.S. Constitution.

252.     Under color of state law, the state defendants and its agents, including Feamster, Hourigan and members of the CFC, violated Plaintiff's federally protected rights.

253.     The state defendants and its agents, including Feamster, Hourigan and members of the CFC, jeopardized, suspended and sought revocation of Plaintiff's bar license with intent, deliberation, knowledge and discriminatory animus against persons with disabilities.

254.     The state defendants and its agents, including Feamster, Hourigan and members of the CFC, have actual bias against disabled applicants.

255.     The state defendants and its agents, including Feamster, Hourigan and members of the CFC, have been aware of the result of its policies and procedures affecting disabled applicants. For decades, the defendants have maintained deliberate and intentionally discriminatory policies and procedures to forbid disabled attorneys from practice.

256.     The state defendants and its agents, including Feamster, Hourigan and members of the CFC, intentionally violated Plaintiff's constitutional rights to equal protection under the law, substantive and procedural due process, and access to the courts, in order to deprive Plaintiff of her livelihood because she is diagnosed with a mental illness.

257.     The state defendants and its agents, including Feamster, Hourigan and members of the CFC, thwarted Plaintiff's right of access to the courts, a fundamental right, when it unlawfully suspended her bar licenses without prompt due process.

258.     The state defendants and its agents, including Feamster, Hourigan and members of the CFC, prevented Plaintiff from adequate and constitutional access to the courts by suspending her license and delaying due process for 853 days.

259.    SCOKY and the KBA, as well as KYLAP, fail to adequately train, supervise and hire its employees and contractors to screen, investigate and punish attorneys in line with federal law.

260.    The state defendants and its agents, including Feamster, Hourigan and members of the CFC violates federal law when it treats abled and disabled applicants for membership differently.

261.    The state defendants and its agents, including Feamster, Hourigan and members of the CFC utilizes an applicant's disability as a justification for more stringent character and fitness investigations, conditional admission and punitive requirements.

262.    The state defendants' and agents' licensing scheme unlawfully creates classes of persons seeking admission for membership; disabled and not. It treats disabled applicants as lacking character and imposes conditions upon their admission.

263.    The state defendants and its agents, including Feamster, Hourigan and members of the CFC unlawfully discriminate disabled attorneys in a manner that is not rationally related to its interest in licensing attorneys with positive character and fitness.

264.    The state defendants and its agents, including Feamster, Hourigan and members of the CFC imputed bad character upon Plaintiff based on her disability.

265.    Plaintiff was deprived of federal rights as a result of the defendants' intentional discrimination and conspiracy to exclude disabled and/or mentally ill members.

266.    The state defendants' and its agents' acts, failures to act, customs, policies and practices caused injuries to Plaintiff. The state defendants and its agents, including Feamster, Hourigan and members of the CFC are responsible for Plaintiff's compensatory and punitive damages, and attorney fees, for its damaging and discriminatory conduct against Plaintiff.

## COUNT VI: VIOLATIONS OF KENTUCKY CIVIL RIGHTS ACT

267.    Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

268.    The KBA, a SCOKY administrative entity, and its agents, including Feamster, Hourigan and the CFC, are a "labor organization" affecting the employment opportunities of its members.

269.    The state defendants and its agents, including Feamster, Hourigan and members of the CFC, violated The Kentucky Civil Rights Act by discriminating against Plaintiff, an otherwise qualified attorney with a disability.

270.    The defendants, including Feamster, Hourigan, and members of the CFC, illegally limited, segregated and/or classified Plaintiff in a manner that deprived her of employment opportunities and adequate access to livelihood.

271.    The state defendants and its agents, including Feamster, Hourigan and members of the CFC, illegally and adversely affected Plaintiff's reputation because of her disability and retaliated when she requested ADA-compliant member agreements.

272.    The state defendants and its agents, including Feamster, Hourigan and members of the CFC, caused injuries to Plaintiff.

273.    Plaintiff is entitled to compensatory damages, punitive damages and attorney fees.

## COUNT VII: MALICIOUS PROSECUTION

274.    Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

275.    The state defendants and its agents, including Northcutt, Thomas, Larkey, Feamster, Hourigan and members of the CFC, discriminated against Plaintiff by diverting her

membership application files for additional review and investigations, then conditioned her license, because of her disability.

276.    The state defendants and its agents, including Feamster, Hourigan and members of the CFC, instituted and continued civil and administrative proceedings to suspend and permanently revoke Plaintiff's bar license.

277.    The state defendants and its agents, including Feamster, Hourigan and members of the CFC, instituted proceedings against Plaintiff with malice, willfulness and/or wanton disregard of Plaintiff's rights.

278.    The Plaintiff and her counsel notified the defendants, including Feamster, Hourigan, and members of the CFC, of ADA-related concerns, but the defendants persisted in its actions against her bar license.

279.    State defendants, Hourigan, Feamster, Northcutt, Larkey, Thomas and members of the CFC lacked probable cause for its actions.

280.    The state defendants and its agents, including Feamster, Hourigan and members of the CFC, are the proximate and efficient cause of Plaintiff's injuries.

281.    State defendants, including Feamster, Hourigan and the members of the CFC, acted to "put the law in motion" against Plaintiff and her livelihood.

282.    The prosecutions were ultimately terminated in Plaintiff's favor on August 28, 2018 when she was granted her full bar licensure after threat of federal suit.

283.    Plaintiff suffered financial damages, embarrassment, humiliation and loss of professional reputation as a direct result of the conduct of the state defendants and its agents, including Feamster, Hourigan and members of the CFC.

284.    Compensatory and punitive damages, and attorney fees, should be awarded to Plaintiff.

## COUNT VIII: DEFAMATION

285.    Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

286.    The state defendants and its agents, including Feamster, Hourigan and members of the CFC, made false statements injurious to Plaintiff's reputation and good name.

287.    The state defendants and its agents, including Feamster, Hourigan, Thomas, Northcutt, Larkey, and members of the CFC, alleged she was unfit to practice law because of her disability.

288.    Damages in a *per se* action of slander are presumed and require no proof of special damages.

289.    Plaintiff demands compensatory and punitive damages, as well as attorney fees and orders necessary to expunge KBA files of defamatory content.

290.    Plaintiff has suffered and will continue to suffer damages in the future as a result of the state defendants' and its agents' conduct.

## COUNT IX: IMPROPER INTERFERENCE WITH CONTRACTUAL RELATIONS

291.    Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

292.    Plaintiff and the KBA had a contractual business relationship; a conditional agreement to practice law in the state of Kentucky.

293.    Hourigan, was aware of Plaintiff's conditional admission agreement, and intentionally interfered with improper motives.

294.    Feamster was aware of Plaintiff's conditional admission agreement, and intentionally interfered with improper motives.

295.    Hourigan intentionally caused the breach of Plaintiff's conditional admission agreement with the KBA when she notified Lisa Larkey (KYOBA) and Feamster that Plaintiff was intentionally non-compliant with orders of the bar.

296.    Hourigan intentionally obscured relevant facts in her reports to the KBA and its affiliated entities, including, but not limited to, the CFC. Plaintiff was not deliberately evading her obligations to the bar. Rather, Plaintiff was, in good faith, requesting ADA-compliant agreements.

297.    The state defendants and its agents, including Feamster, Hourigan and CFC members intended to discriminate and punish Plaintiff with malice.

298.    Hourigan failed to comply with ADA requirements when crafting a KYLAP agreement for Plaintiff. Hourigan utilizes boilerplate language and "standard conditions" for disabled and disciplined members alike, regardless of their individual behavioral history.

299.    Feamster's acts, omissions, practices and procedures resulted in the discrimination of Plaintiff, and subsequent damages, on the basis of her disability.

300.    The state defendants and its agents, including Feamster, Hourigan and members of the CFC, consider disabled members as having a conduct or character problem in violation of the ADA and similar anti-discrimination statutes.

301.    Hourigan applied boilerplate KYLAP conditions to Plaintiff without regard for her disability.

302.    Feamster applied boilerplate conditional licensing terms to Plaintiff without regard for her disability.

303.    Hourigan disregarded and misrepresented the professional opinions of a qualified, licensed medical practitioner while negotiating a KYLAP agreement with Plaintiff.

304.    Feamster disregarded and misrepresented professional opinions of medical and legal professionals assisting Plaintiff.

305.    Hourigan's reports to the KBA contradicted and misrepresented the expert opinions of, and the contents of her communications with, Plaintiff's doctor.

306.    Feamster failed to conduct duly diligent investigations into the statements of Hourigan.

307.    Hourigan failed to properly investigate Plaintiff's medical history, and made assumptions regarding her condition and medications absent competent medical evidence.

308.    Hourigan acted in reckless disregard of the truth resulting in reputational, professional, and financial damages to Plaintiff.

309.    Feamster acted in reckless disregard of the truth, and caused Plaintiff reputational, professional and monetary injury.

310.    The state defendants and its agents, including Feamster, Hourigan and members of the CFC disregarded the truth of the matters affecting Plaintiff's licensure.

311.    Hourigan failed to heed ADA concerns and HIPAA confidentiality while contracting with Plaintiff and sought in-depth medical records disclosures after she was informed that the ADA did not permit such inquiry.

312.    Hourigan made false statements regarding the content of the KYLAP agreement and did not provide a draft contract in good faith prior to meeting with Plaintiff.

313.    Hourigan made a false statement to KBA officials regarding Plaintiff's KYLAP agreement and her physician's statements regarding alcohol use. Feamster relied upon Hourigan's false statements.

314.    Feamster and Hourigan knew their statements were false.

315.   Feamster and Hourigan improperly interfered with Plaintiff's conditional admission agreement with the KBA.

316.   Hourigan made false statements to SCOKY, KBA, KBBE, KBG, KYOBA, CFC and Feamster when she reported that Plaintiff violated her conditional admission agreement.

317.   Hourigan misrepresented to the KBA the reasons for disputes arising in negotiations with Plaintiff.

318.   Hourigan imputed alcohol dependency to Plaintiff without justification.

319.   Hourigan's opinions were not based on reason or good faith investigation.

320.   Hourigan lied to the CFC, Feamster and Plaintiff about her communications with Plaintiff's medical doctor and independently accused Plaintiff of having an alcohol problem that needed regulation.

321.   Hourigan was not justified in taking action against Plaintiff's license under the circumstances.

322.   Feamster was not justified in taking action against Plaintiff's license under the circumstances.

323.   Hourigan's statements were made in bad faith and with improper purposes.

324.   Feamster's statements and pleadings (i.e. show cause orders) were made in bad faith and with improper purpose.

325.   Hourigan's and Feamster's malicious actions and inactions caused Plaintiff's license suspension for 853 days.

326.   Hourigan implied to the KBA and its regulating officials that Plaintiff lacked character and fitness to practice law.

327.   Hourigan and Feamster intentionally caused the KBA to suspend Plaintiff's license to practice law and seek her permanent license revocation.

328.     Feamster recklessly disregarded the falsity of Hourigan's claims, and presented Plaintiff in violation to the CFC.

329.     Feamster was aware that Plaintiff was making good faith efforts to negotiate conditional licensing terms that were in compliance with applicable laws, but she sought to permanently revoke Plaintiff's license to practice law nonetheless.

330.     Feamster excessively published defamatory matters to the CFC, and perhaps the members of the Supreme Court, Board of Governors and others, causing a domino effect of financial and reputational harm to Plaintiff.

331.     Feamster's misrepresentations to the CFC caused Plaintiff's license suspension for 853 days without justification.

332.     With malicious motives, Feamster and Hourigan, jointly and severally made an attack upon the character of Plaintiff beyond any protection that qualified privilege may afford.

333.     Hourigan acted with such malice, oppression, fraud, and reckless disregard to necessitate punitive damages in this cause.

334.     Feamster acted with such malice, oppression, fraud, and reckless disregard to necessitate punitive damages in this cause.

335.     The state defendants and agents, and individuals named herein, are legally responsible for Plaintiff's special, compensatory and punitive damages, as well as attorney fees.

<u>**COUNT X - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**</u>

336.     Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

337.     The state defendants and its agents, including Feamster, Hourigan and members of the CFC, by extreme and outrageous conduct, intentionally and/or recklessly caused severe emotional distress to Plaintiff, and is subject to liability for such emotional distress.

338.     The state defendants and its agents, including Feamster, Hourigan and members of the CFC, intended to cause Plaintiff emotional distress.

339.     The state defendants and its agents, including Feamster, Hourigan and members of the CFC, had reason to know that such distress would result from their conduct.

340.     Plaintiff suffered severe emotional distress due to the bad conduct of the state defendants and its agents, including Feamster, Hourigan and members of the CFC. The defendants' actions exceeded the bounds of common and professional decency.

341.     The state defendants and its agents, including Feamster, Hourigan and members of the CFC, intended to condition Plaintiff's membership because of her disability, even though medical experts expressed no concerns for her character, fitness, nor safety.

342.     The state defendants and its agents, including Feamster, Hourigan and members of the CFC, were aware that their conduct was harmful and detrimental to Plaintiff's profession, reputation, and finances.

343.     The state defendants and its agents, including Feamster, Hourigan and members of the CFC did not curtail their discriminatory conduct despite Plaintiff's good faith efforts to negotiate ADA-compliant membership terms.

344.     The state defendants and its agents, including Feamster, Hourigan and members of the CFC caused tangible, financial, reputational, emotional, professional, and other injuries to Plaintiff.

345.     Punitive damages are appropriate because the state defendants and its agents, including Feamster, Hourigan and members of the CFC, acted in an oppressive fashion with specific intent to cause cruel and unjust hardships to Plaintiff, and/or the state defendants and its agents acted in a wanton and/or reckless disregard for Plaintiff's constitutional rights, liberties, reputation, livelihood, confidentiality, and property interests.

## REQUESTS FOR RELIEF

**WHEREFORE**, Plaintiff demands a jury trial and requests orders of this Court:

a.      summoning the state defendants and its agents, including Feamster, Hourigan and members of the CFC, to appear and answer;

b.      finding that the Plaintiff is a qualified disabled person in accordance with the ADA as she either has a disability or is "regarded as having a disability";

c.      finding that the practices and policies of the state defendants and its agents, including Feamster, Hourigan and members of the CFC, discriminate attorneys with disabilities and tend to screen out members based on unlawful eligibility criteria in violation of the ADA;

d.      finding that the state defendants and its agents, including Feamster, Hourigan, Northcutt, Thomas, Larkey, and members of the CFC, wrongfully subjected Plaintiff to additional, arbitrary and/or unnecessary expense, effort, costs, surcharges and other liabilities in her admissions process because of her disability or their perception of her as having a disability;

e.      finding that the state defendants and its agents, including Feamster, Hourigan and members of the CFC, acted with discriminatory intent, malice, knowledge and/or bad faith;

f.      finding that conduct of the state defendants and its agents, including Feamster, Hourigan and members of the CFC, was outrageous and shocking;

g.      finding the state defendants and its agents, including Feamster, Hourigan, Thomas, Northcutt, Larkey, and members of the CFC, to be deficient in assuring HIPAA compliance and medical confidentiality of member files, and ordering Plaintiff's private medical records and references thereto to be expunged from all KBA files;

h.      finding the state defendants and its agents, including Feamster, Hourigan and members of the CFC, to be deficient in procedures to purge member files of dismissed "show

cause" pleadings that reveal protected and confidential information, and/or impute poor character to Plaintiff,

i.      ordering the state defendants and its agents, including Feamster, Hourigan, Northhcutt, Larkey, Thomas and members of the CFC, to expunge and redact Plaintiff's applications and member files of confidential, HIPAA-protected medical information and Feamster's abandoned "show cause" actions;

j.      finding the state defendants and its agents, including Feamster, Hourigan and members of the CFC, liable for Plaintiff's injuries and ordering payment to Plaintiff for compensatory, punitive and special damages including, but not limited to, reimbursements for dues paid while suspended, refunds of bond monies paid for formal hearing proceedings, lost wages, reputation damages, emotional distress, humiliation, loss of livelihood, mental anguish and other injuries acknowledged under law;

k.      finding Plaintiff reasonably incurred attorney fees and related costs in her admissions process and in bringing this action for damages, and ordering the state defendants and its agents, including Feamster, Hourigan and members of the CFC, to pay for all legal efforts, experts, consultants, fees and costs;

l.      awarding any and all punitive and compensatory damages to effectuate justice;

m.      ordering monetary, injunctive and/or declaratory relief to effectuate justice; and

n.      awarding any and all other relief deemed appropriate, just and proper.

o.      Plaintiff hereby reserves the right to amend this complaint.

RESPECTFULLY SUBMITTED,

BRITT STEVENSON
THE WOLF BUILDING

150 S. THIRD STREET
LOUISVILLE, KY 40202
T: 502-583-2888
F: 502-589-2825
brittstevensonlaw@gmail.com