**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | | |
|---|---|---|
| **JANE DOE** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:19-cv-236-GNS** |
| | ) | |
| **v.** | ) | *Filed Electronically* |
| | ) | |
| **THE SUPREME COURT OF** | ) | |
| **KENTUCKY; THE KENTUCKY BAR** | ) | |
| **ASSOCIATION; THE KENTUCKY** | ) | |
| **BOARD OF BAR EXAMINERS; THE** | ) | |
| **KENTUCKY OFFICE OF BAR** | ) | |
| **ADMISSIONS; THE KENTUCKY BAR** | ) | |
| **CHARACTER AND FITNESS** | ) | |
| **COMMITTEE; THE KENTUCKY** | ) | |
| **LAWYERS' ASSISTANCE PROGRAM** | ) | |
| **FOUNDATION, INC.; ELIZABETH** | ) | |
| **SUSAN FEAMSTER; PAMELA** | ) | |
| **YVETTE HOURIGAN;** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **THE KENTUCKY LAWYERS'** | ) | |
| **ASSISTANCE PROGRAM** | ) | |
| **COMMISSION** | ) | |
| | ) | |
| **Serve: Asa "Pete Gullett** | ) | |
| **323 West Main Street** | ) | |
| **Suite 600** | ) | |
| **Louisville, KY 40202** | ) | |
| | ) | |
| **Defendants.** | ) | |

\* \* \* \* \*

**<u>FIRST AMENDED COMPLAINT</u>**

Plaintiff Jane Doe, by counsel, for her First Amended Complaint against

Defendants Supreme Court of Kentucky, Kentucky Board of Bar Examiners,

Kentucky Office of Bar Admissions, Kentucky Bar Association, Kentucky Bar

1

Character and Fitness Committee, Kentucky Lawyers' Assistance Program,

Elizabeth Susan Feamster, and Pamela Yvette Hourigan, states as follows:

## JURISDICTION & VENUE

1.    This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

2.    This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

3.    Venue is proper in the Western District of Kentucky, Louisville Division, pursuant to 28 U.S.C. § 1391(b)(2) as substantial part of the events and/or omissions giving rise to Plaintiff's action occurred and are occurring within this judicial district.

## THE PARTIES

4.    The Plaintiff requests anonymity to prevent further injustice. Plaintiff is an attorney, first licensed to practice law in Florida in 2006, and conditionally licensed in Kentucky as of April 28, 2016. Plaintiff is a resident of the State of Kentucky, residing in the Western District. Plaintiff is a person with a qualifying disability and is otherwise *sui juris*.

5.    Defendant SCOKY was created in 1975 by state constitutional amendment. SCOKY has exclusive jurisdiction to regulate the admissions of persons to the practice of law. SCOKY has discretion to review, approve and create rules governing bar admissions and membership. SCOKY, and its affiliated agencies, are "public entities" within the definitions of Title II of the ADA, 42 U.S.C. § 12131(1).

6.     SCOKY created Defendant KBA in 1980 under SCR 3.025. The KBA defines itself as "an independent agency of [SCOKY]" on its website. The KBA possesses the sole authority to regulate lawyers in Kentucky. The KBA is a public entity.

7.     Defendant KBBE administers the bar examination and oversees bar admission qualifications, procedures and related issues. The KBBE is a public entity.

8.     Defendant CFC is an administrative board within the SCOKY which conducts hearings and makes character and fitness determinations regarding bar exam applicants. The CFC is a state entity.

9.     Defendant KYOBA analyzes bar exam applications and conducts investigations with the power to divert applications to the CFC for further review. KYOBA works in conjunction with the CFC to recommend admission to candidates who show good character and fitness standards. KYOBA is a public entity.

10.     Defendant Feamster is an attorney and member of the KBA acting as General Counsel and Director of the KBA, CFC, KBBE, KYOBA and other entities within the KBA. Feamster is sued in her individual capacity.

11.     Defendant KYLAP Foundation is a Kentucky corporation designated as a 501(c)(3) nonprofit entity created pursuant to SCOKY SCR 3.910(8) to "assist Kentucky's lawyers, law students and judges who suffer from impairments including drug, alcohol, or other addictions, depression, and other mental health disorders." KYLAP Foundation is a public entity.

12.     Defendant KYLAP Commission was created pursuant to SCR 3.920 with "the general responsibility for the administration of [the KYLAP program] with the authority to "[a]dopt operating policies and procedures as necessary and appropriate to implement" the KYLAP program and the SCOKY rules. KYLAP Commission is a public entity.

13.     Defendant Pamela Yvette Hourigan is responsible for executing orders of conditional admissions mandated by SCOKY and its affiliated entities (i.e. CFC, KYOBA and KBBE). Hourigan is an attorney licensed by the KBA and acting Director of KYLAP with the authority to influence the KBA's membership decisions. Hourigan is sued in her official and individual capacity.

14.     For the purpose of this Complaint, State Defendants includes the Supreme Court of Kentucky, the Kentucky Bar Association, the Kentucky Board of Bar Examiners, the Kentucky Office of Bar Admissions, the Kentucky Bar Character and Fitness Committee, the Kentucky Lawyers' Assistance Foundation, Inc., and the Kentucky Lawyers' Assistance Program Commission.

## FACTUAL BACKGROUND

15.     Plaintiff was born and raised in the Commonwealth of Kentucky. She graduated from college at a Kentucky university in 2003, then attended law school and practiced in Florida from 2006 to present.

16.     Plaintiff was diagnosed with Bipolar I Disorder in 2014 after experiencing mania while taking a prescribed antidepressant medication. Without any prior history of illness, Plaintiff began experiencing manic episodes and behaving out of character, although never harmful to herself or others.

4

17.    Plaintiff worked in government and private practices in Florida before returning to Kentucky in 2014.

18.    At all times pertinent to this lawsuit, Plaintiff was in good standing with the Florida Bar.

19.    At all times pertinent to this lawsuit, Plaintiff remains a qualified individual with a disability. Plaintiff suffers from a mental impairment and/or has a record of impairment which substantially limits one or more of her major life activities.

20.    The Florida Bar, concerned with certain social media posts by Plaintiff, placed her in a diversion program contract to be monitored by the Florida Lawyers' Assistance Program (FLAP) for three years (2015 – 2018) whereby Plaintiff's Kentucky physician would monitor and report to the FLAP physicians.

21.    Since her diagnosis, the Plaintiff's medical doctors have encouraged and recommended Plaintiff continue practicing law without concerns for her or the public's safety.

22.    Plaintiff's psychiatrist monitored her progress and reported prescription and therapy compliance to the FLAP director from 2015 to 2018.

23.    Plaintiff's FLAP agreement did not require residency in Florida, substance abuse testing, or disclosure of her FLAP agreement to her employers.

24.    On June 15, 2018, FLAP released Plaintiff from her Florida diversion agreement after completing all conditions and obtaining a letter from her physician indicating her full compliance with treatment. Plaintiff never violated her FLAP

agreement and Plaintiff was never prohibited from practicing law in the state of Florida.

25.     On December 9, 2015, Plaintiff submitted an online application to the KBA and otherwise complied with SCR 2.022 requesting the KBA's approval to sit for the February 2016 bar exam. Florida does not reciprocate bar admission with other states.

26.     The KBA's application process required Plaintiff to disclose she had a history of and treatment for depression and Bipolar I Disorder. In compliance with the full disclosure and candor requirements of the KBA, Plaintiff responded in good faith to the KBA's questions.

27.     On December 9, 2015, as required by the KBA application, Plaintiff mailed two notarized medical records releases allowing the KBA and its affiliated entities and agents complete access to her personal and private medical records, including treatment notes.

28.     On December 10, 2015, Plaintiff supplemented her KBA application with a certificate of good standing from the Florida Bar Association that revealed no public discipline since Plaintiff's admission in April of 2006.

29.     On December 17, 2015, Plaintiff received an email from Kristen E. Northcutt, Deputy Director of KYOBA, notifying her KYOBA required a medical release from Plaintiff's psychiatrist in Florida.

30.     On that same day, Plaintiff returned a third medical records release, signed and notarized, via emailed PDF, to Northcutt granting complete access to FLAP monitoring records.

31.     On December 29, 2015, Plaintiff received an email from "NoReply@kyoba.org" confirming that her supplemental application requirements were complete.

32.     On January 7, 2016, Northcutt notified Plaintiff KYOBA had not received the records from Plaintiff's psychiatrist in Florida and Plaintiff's application could not be processed until the records were received.

33.     On January 7, 2016, Plaintiff notified Northcutt her psychiatrist would fulfill KYOBA's records request shortly.

34.     On January 15, 2016, Plaintiff provided an individually-tailored letter from her psychiatrist assuring the KBA of her compliance with medical advice, prescription instructions, and FLAP contract requirements. Plaintiff did so in order to avoid practice limitations, delays for further CFC investigation(s) and/or punitive sanctions from the KBA. The physician's letter stated that Plaintiff is compliant with treatments and expected to function professionally while under treatment without risk to herself or others.

35.     Under ADA guidelines pertaining to the depth of permitted inquiry, this physician's letter should have been sufficient to conclude the KBA's investigation. Despite this letter, the state defendants and its agents continued its investigation.

36.     On January 19, 2016, Plaintiff was required to send a broader medical records release form to Stephanie Thomas, KYOBA Application Analyst, which permitted the KBA access to inpatient records, outpatient records, and treatment notes.

37.    On February 3, 2016, Northcutt notified Plaintiff she had not been cleared by the Character and Fitness Committee and would be required to complete a waiver in order to sit for the February bar exam.

38.    On February 8, 2016, having no other options, the Plaintiff signed and notarized the waiver and returned it to KYOBA.

39.    On February 23 and 24, 2016, Plaintiff took the Kentucky Bar Examination in Lexington, Kentucky.

40.    On March 28, 2016 Plaintiff received a "consent agreement" for conditional admission from the KBA stating that she could not practice without, among other conditions: 1) a KYLAP agreement; 2) continued compliance with FLAP; 3) quarterly reporting to the CFC; 4) physician and treatment compliance; 5) proof of compliance submissions; 6) disclosures of information regarding "adverse incidences"; and 7) residency in Kentucky for the entire period of the agreement unless relocation is for employment and the KBA approves.

41.    Plaintiff had no option but to sign the agreement so she could practice law.  Plaintiff signed in good faith and sought to negotiate a fair agreement with KYLAP that would operate similarly to her existing FLAP agreement.

42.    Plaintiff provided Hourigan with a copy of her FLAP agreement for use in crafting her KYLAP agreement and forwarded the January 15, 2016 letter from her physician to Hourigan's office.

43.    On March 28, 2016, the Plaintiff emailed Hourigan to inquire and set up her KYLAP agreement.

44.     On or about March 31, 2016, Hourigan assured Plaintiff that her KYLAP agreement would be similar to her FLAP agreement, and would not limit work in or out of Kentucky. Hourigan further assured Plaintiff via telephone she would craft an agreement tailored to her diagnosis whereby Hourigan would be Plaintiff's monitor. Hourigan told Plaintiff that she could telephone or text her check-ins to comply with monitoring. Hourigan requested a copy of Plaintiff's FLAP agreement be emailed to her.

45.     On April 8, 2016, Plaintiff learned she had passed the Kentucky bar exam and tendered payment for prorated dues and the fee for the swearing-in ceremony scheduled in Frankfort for April 28, 2016.

46.     On April 13, 2016, after no contact from Hourigan or KYLAP staff for two weeks regarding the agreement, Plaintiff emailed Hourigan again to schedule the required in-person meeting. The Plaintiff and Hourigan agreed to meet prior to the swearing-in ceremony.

47.     On April 13, 2016, the parties verbally discussed the KYLAP agreement and how it would be crafted to mirror Plaintiff's FLAP agreement. The KYLAP agreement was to require no additional conditions or monitors.

48.     On April 26, 2016, Plaintiff had still not received the proposed KYLAP agreement as promised. Plaintiff emailed Hourigan to confirm a previously scheduled April 28, 2016 meeting.

49.     On April 28, 2016, Hourigan sent a text message that she would be at Plaintiff's hotel by 8:15 a.m. Hourigan, later, texted that she was running late and they would meet on the steps of the Capitol.

9

50.     Just minutes prior to her swearing-in, Hourigan met with Plaintiff within earshot of other bar applicants outside of the Capitol entry doors. During the discussion, Plaintiff was required to publicly discuss the KYLAP contract and Plaintiff's health matters with Hourigan.

51.     Hourigan presented a proposed KYLAP agreement that was not individually-tailored as promised. Instead, it required random drug testing and mouth swab testing for alcohol. Plaintiff has never had issues with drugs or alcohol. These and other provisions were unjustified.

52.     Plaintiff objected and informed Hourigan that she would not sign the proposed agreement because it was boilerplate and reflected a KYLAP agreement for someone with drug and alcohol issues. Plaintiff also informed Hourigan that the agreement violated her rights under the ADA, that such conditions were unjustified, and the ADA does not permit the disabled to be treated like criminals.

53.     Hourigan indicated that the alcohol testing provisions were standard KYLAP conditions, and that her research showed that Plaintiff's prescribed medications required alcohol abstinence.

54.     One fellow applicant, hearing the discussion between Plaintiff and Hourigan, asked Plaintiff about the meeting. Plaintiff was again embarrassed and humiliated that her private information was presented in a public forum.

55.     Absent a KYLAP agreement, Plaintiff was unable to practice law. Between April 28, 2016 and May 2, 2016, Plaintiff continued attempts to reach an ADA-compliant agreement without success.

56.     On April 28, 2016, Hourigan requested a fourth medical records release from Plaintiff, and Plaintiff complied by sending a release to both Hourigan and her physician.

57.     On May 5, 2016, Plaintiff, hearing nothing and anxious to begin practicing law in Kentucky, contacted Hourigan via email to check on the status of her KYLAP agreement, asking if there was anything she could do to expedite medical records to ease the process.

58.     Between May 5, 2016 and May 10, 2016, Plaintiff and Hourigan exchanged emails regarding discussions with the doctor. Hourigan asked Plaintiff to have her physician contact her directly.

59.     Plaintiff arranged for a call between Hourigan and her physician on May 9, 2016.

60.     On May 9, 2016, Plaintiff's physician called at the scheduled time, but Hourigan did not answer. He was forced to leave a message.

61.     During this time, Plaintiff lost several opportunities to work for private clients and law firms. Plaintiff was forced to leave a position at a private law firm because she was ineligible to practice law.

62.     Plaintiff's physician later advised Hourigan that he did not recommend the alcohol abstinence provision, as he did not see its necessity or justification.

63.     On May 16, 2016, Hourigan notified Plaintiff she refused to accept the physician's medical opinion and would not drop the alcohol abstinence provision from the KYLAP agreement.

64.    Hourigan disregarded the physician's opinion and sought the imposition of boilerplate and punitive conditions without medical evidence. Hourigan acted in an illegal and intentionally discriminatory manner and violated provisions of the ADA.

65.    On June 2, 2016, Plaintiff retained Peter Ostermiller to represent her in regard to her Kentucky bar admission.

66.    On June 6, 2016, Hourigan notified Lisa Larkey of KYOBA that Plaintiff was in violation of her conditional admission contract and requested an order to show cause to punish Plaintiff for refusing to sign Hourigan's unlawful KYLAP contract.

67.    On June 14, 2016, KBA General Counsel Feamster also notified Plaintiff she was in violation of her conditional admission contract.

68.    On June 21, 2016, Feamster asked Ostermiller to confirm Plaintiff was not practicing law in Kentucky.

69.    Between April 28, 2016 and August 28, 2018, Plaintiff did not practice law in the Commonwealth of Kentucky.

70.    On July 5, 2016, Ostermiller informed Feamster that Plaintiff would not consent to the proposed KYLAP agreement.

71.    On July 19, 2016, via counsel, Plaintiff sent an additional letter to the KBA and Hourigan from her doctor, notifying them Plaintiff showed no signs of substance abuse and could consume alcohol on her medication.

72.    On July 29, 2016, the KYLAP agreement was revised regarding alcohol monitoring conditions, but the residency requirements, additional monitoring and

additional counseling requirements remained in the conditional admission and KYLAP agreements. It provided that if Plaintiff changed residency for more than a week, she "SHALL be subject to review and full compliance with all rules and regulations governing admission to the bar." The new proposed KYLAP agreement stated that Plaintiff must notify Hourigan if leaving town for business or pleasure for one week or more. Plaintiff was concerned with the residency requirement given that she had was prohibited from working in Kentucky and required out-of-state work to support herself.

73.     Unable to leave the state under the terms of the conditional agreement and suspended from the practice of law, Plaintiff volunteered at a non-profit center which receives Kentucky Bar Foundation ("KBF") grants, among other federal, state and local funding, to assist in refugee resettlement. Plaintiff's volunteerism lead to an offer for employment to teach basic introductory civics, safety and sewing courses to refugees for a low hourly pay through a KBF grant. In this job, Plaintiff would not perform legal tasks; the center's immigration attorney and her assistant engaged in those functions. The position required Plaintiff to organize courses, schedule translators and contact speakers/trainers for refugees to learn about dialing 9-1-1, CPR, avoiding arrest, minding domestic violence laws, getting children to school, obtaining medical insurance, going to doctors, getting vaccines, applying for public assistance, finding translators at the courthouse, job readiness, sewing, and other basic civics topics for new residents.

74.     In October 2016, Plaintiff reported this position to the KBA. Thereafter, Feamster demanded Plaintiff prove that she was not practicing law and

required her employer's contact information. Feamster also demanded Plaintiff's job description, advertisements, supervisor contact information, a written explanation how she learned of the job, and detailed information concerning each interview she attended.

75.    On November 7, 2016, Feamster notified Plaintiff via email that she must appear before the KBA's CFC for a formal hearing and reiterated Plaintiff must not practice law in Kentucky.

76.    On November 15, 2016, Plaintiff emailed Feamster requesting a professional conversation in lieu of a costly hearing to discuss the ADA issues and how the parties could resolve concerns on both sides.

77.    Plaintiff had been unable to practice for seven months after expending a great deal of money in application and exam costs and could not afford the hearing fee.

78.    Feamster responded by email that the CFC was unwilling to accommodate Plaintiff's request, that a hearing was mandatory, and Plaintiff must pay a $750 bond.

79.    In response to Plaintiff's request for time to pay for the hearing, Feamster agreed that the hearing could be paid for and scheduled after the 2016 holiday season.

80.    In an effort to prevent additional disclosure of her private medical information to her new employer, Plaintiff wrote a lengthy email hoping to provide Feamster the information she sought regarding Plaintiff's current position.

81.    Feamster continued to demand additional documents and contact information for Plaintiff's employer.

82.    Defendants' conduct caused Plaintiff such distress that she required inpatient care beginning December 7, 2016.

83.    Plaintiff sent an email to Feamster on February 16, 2017 to discuss scheduling the CFC hearing and provide the bond payment.

84.    On April 14, 2017, an updated Second Order to Show Cause was sent to Plaintiff.

85.    On April 27, 2017, the formal hearing was held. Plaintiff again expressed her concerns with the Defendants' ADA noncompliance.

86.    During the hearing, Feamster failed to raise conduct or behavioral concerns to justify issuing Plaintiff a conditional license. Instead, she relied only on Plaintiff's Bipolar I Disorder diagnosis, treatment and private medical records. Feamster further admitted the agreement was standard for all conditionally admitted attorneys and was not individually-tailored.

87.    On May 22, 2017, Feamster notified Plaintiff that the CFC was recommending SCOKY permanently revoke Plaintiff's license.

88.    On July 29, 2017, Plaintiff was billed for KBA membership dues, which she paid timely.

89.    On January 3, 2018, Plaintiff requested an exemption to the New Lawyer Program as an attorney with practice experience "in another jurisdiction for a minimum of five years." Plaintiff was denied and attended the NLP on January 25 and 26, 2018.

15

90.     Since Plaintiff's swearing-in ceremony and bar number receipt on April 28, 2016 in Frankfort, she continually appeared on the KBA's public website as an attorney with full practice capability, listed in "good standing". However, she had to turn away private clients and explain why she could not assist in Kentucky cases.

91.     On May 30, 2018, over a year after the CFC hearing and Feamster's communication that the CFC intended to recommend permanent revocation, Feamster emailed Plaintiff asking her to attend an informal CFC hearing.

92.     On June 1, 2018, Plaintiff received notice from the Florida Bar and FLAP that the FLAP conditions were met and diversion was concluded. In closing the file, Plaintiff's physician/monitor remarked that he had no concerns regarding her mental health and encouraged her to continue practicing law.

93.     On July 6, 2018, Plaintiff attended the informal hearing where she was again questioned by the CFC regarding her disability. At the close of the hearing, Plaintiff hand-delivered the most recent physician/monitor letter and the Florida Bar's release to the CFC and Feamster.

94.     On July 12, 2018, Plaintiff received an email from Feamster demanding more information regarding Plaintiff's medical treatment since 2016.

95.     On August 13, 2018, Plaintiff responded, again advising Feamster of Defendants' ongoing ADA violations and seeking unconditional admission.

96.     On August 22, 2018, Feamster located the physician's letter Plaintiff hand-delivered at the July 6, 2018, informal hearing and advised Plaintiff she forwarded the letter to the CFC committee.

97.    On August 28, 2018, Feamster notified Plaintiff of her unconditional admission to the Kentucky bar.

98.    As recently as December 2018, Plaintiff's official bar files contained confidential and protected health information and multiple orders to show cause which reference her disability and treatment as character and professional flaws. Plaintiff's official KBA files contained no notation that the orders to show cause have been dismissed.

## COUNT I
## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT
## (STATE DEFENDANTS)

99.    Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

100.    State Defendants are public entities subject to Title II of the ADA as defined by 42 U.S.C. § 12131(1).

101.    Plaintiff is a qualified individual with a disability as defined by 42 U.S.C. § 12131(2).

102.    State Defendants violated the Title II of the ADA by administering its licensing and bar admission system in a manner that denied Plaintiff the opportunity to participate in and the benefits of the licensing and bar admission system based solely on her disability.

103.    State Defendants violated Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations by discriminating against Plaintiff in its administration of its licensing and bar admission system based solely on her disability.

104.    State Defendants violated the ADA by retaliating against Plaintiff for opposing an act or practice made unlawful by the ADA/

105.    Defendants took these actions with discriminatory intent and with deliberate indifference to Plaintiff's federally protected rights.

106.    Further, Defendants engaged in this conduct with malice or reckless disregard for Plaintiff's federally protected rights.

107.    Plaintiff has suffered injury due to the actions and inactions of Defendants and is entitled to compensatory and punitive damages and is entitled to recover those attorney fees, expert fees, costs and expenses incurred in this case from the Defendants pursuant to 42 U.S.C. § 12101 *et seq*.

## COUNT II
## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT
## <u>STATE DEFENDANTS</u>

108.    Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

109.    Plaintiff is a qualified individual within the meaning of the Rehabilitation Act.

110.    State Defendants are public entities within the meaning of the Rehabilitation Act.

111.    State Defendants, as recipients of federal financial assistance, discriminated against Plaintiff as a qualified individual with a disability within the meaning of the Rehabilitation Act by administering its licensing and bar admission system in a manner that excluded her participation in, and denies her benefit of, the licensing and bar admission system solely based on her disability.

18

112.    State Defendants violated the Rehabilitation Act by discriminating against Plaintiff in administering its licensing and bar admission system solely based on her disability and retaliated against Plaintiff for notifying State Defendants of their ADA and Rehabilitation Act violations.

113.    Plaintiff has suffered injury due to the actions and inactions of Defendants and is entitled to compensatory and punitive damages and is entitled to recover those attorney fees, expert fees, costs and expenses incurred in this case from the Defendants pursuant to 29 U.S.C. § 794a.

**COUNTS III**
**DEPRIVATION OF EQUAL PROTECTION- U.S. CONST. AMEND. XIV**
**<u>(ALL DEFENDANTS)</u>**

114.    Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

115.    Plaintiff challenges the Defendants' licensing and bar admission scheme both facially and as applied to her.

116.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws.

117.    Under the Equal Protection Clause, discrimination based on disability is presumptively unconstitutional and subject to heightened scrutiny.

118.    Defendants' licensing and bar admission system discriminates against individuals with mental disabilities like Plaintiff.

119.    Defendants' licensing and bar admission system facially classifies people based on their status as individuals with mental disabilities.

19

120.   Under Defendants' licensing and bar admission system, individuals with mental disabilities like Plaintiff are required to disclose and provide personal and private medical information and records not required of those with physical disabilities or no disabilities.

121.   Defendants' licensing and bar admission system and its discrimination against individuals with mental disabilities like Plaintiff is not substantially related to any important government interest.

122.   Defendants' licensing and bar admission system denies individuals with mental disabilities, like Plaintiff, equal protection of the laws in violation of the Equal Protection Clause of the Fourteenth Amendment.

123.   Defendants' discriminatory actions against Plaintiff based on her status as a individual with a mental disability were intentional or committed with reckless or callous disregard for her rights.

124.   As a result of Defendants' discriminatory licensing and bar admission system, Plaintiff has suffered injury and is entitled to compensatory and punitive damages as well as reasonable costs, including attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT IV:
## DEFAMATION
## (DEFENDANTS FEAMSTER AND HOURIGAN)

125.   Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

126.   Feamster and Hourigan made false statements injurious to Plaintiff's reputation and good name.

127.    Feamster and Hourigan alleged Plaintff was unfit to practice law because of her disability.

128.    Damages in a *per se* action of slander are presumed and require no proof of special damages.

129.    Plaintiff demands compensatory and punitive damages, as well as attorney fees and orders necessary to expunge KBA files of defamatory content.

130.    Plaintiff has suffered and will continue to suffer damages in the future as a result of Feamster and Hourigan's conduct.

### COUNT V
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (DEFENDANTS FEAMSTER AND HOURIGAN)

131.    Plaintiff hereby incorporates by reference each of the allegations set forth in the preceding paragraphs as if re-alleged fully herein.

132.    Feamster and Hourigan intended to cause Plaintiff emotional distress by their conduct toward Plaintiff.

133.    Feamster and Hourigan had reason to know that such distress would result from their conduct.

134.    Feamster and Hourigan's conduct caused Plaintiff to experience severe emotional distress.

135.    Feamster and Hourigan were aware that their conduct was harmful and detrimental to Plaintiff's profession, reputation, and finances.

136.    Feamster and Hourigan did not curtail their discriminatory conduct despite Plaintiff's good faith efforts to negotiate ADA-compliant terms in the conditional admission and KYLAP agreements.

137.    Feamster and Hourigan caused tangible, financial, reputational, emotional, professional, and other injuries to Plaintiff.

138.    Punitive damages are appropriate because Feamster and Hourigan acted in an oppressive fashion with specific intent to cause cruel and unjust hardships to Plaintiff.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

1.    Entry of judgment in favor of them, together with an award of compensatory damages;

2.    An award of attorney fees, costs and expenses incurred in prosecuting this action;

3.    Punitive damages;

4.    Injunctive relief requiring State Defendants to remove show cause orders and medical information and records from Plaintiff's file;

5.    Pre-judgment and post-judgment interest at the maximum rate allowed by law;

6.    Trial by jury on all triable issues; and

7.    All other relief to which they may be entitled.

Respectfully submitted,

CRAIG HENRY PLC

/s/ Tyler A. Larson
Michele Henry
Tyler A. Larson
401 West Main Street, Suite 1900
Louisville, Kentucky 40202
T: (502) 614-5962
F: (502) 614-5968
mhenry@craighenrylaw.com
tlarson@craighenrylaw.com
*Counsel for Jane Doe*

## CERTIFICATE OF SERVICE

I certify that the foregoing was served by operation of the Court's ECF system on October 21, 2019 upon all counsel of record.

/s/ Tyler Larson
*Counsel for Jane Doe*